Ronald L. DeLORME,
Plaintiff–Appellant,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant–Appellee.

No. 89–35661.

United States Court of Appeals, Ninth Circuit.

Submitted July 13, 1990 *.
Decided Jan. 23, 1991.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Teresa L. Sturm, Hopkins, French, Crockett, Springer & Hoopes, Idaho Falls, Idaho, for plaintiff-appellant.

Richard H. Wetmore, Asst. Regional Counsel, Dept. of Health and Human Services, Seattle, Wash., for defendant-appellee.

Appeal from the United States District Court for the District of Idaho.

Before FLETCHER, FERGUSON and FERNANDEZ, Circuit Judges.

FERGUSON, Circuit Judge:

Ronald DeLorme injured his back repeatedly during and after his employment as an interstate bus driver. He appeals from the district court's grant of summary judgment in favor of the Secretary, Department of Health and Human Services ("the Secretary") rejecting his application for disability benefits. We reverse and remand.

## I. FACTS

DeLorme was a bus driver employed by Greyhound when he sustained his first back injury while changing a tire in 1977. He wanted to resume work as a driver, and returned to work although his orthopedist warned that the physical strain at the job might create further problems. In fact, he suffered repeated back problems. After a hospitalization in October 1977, he was diagnosed as having a ruptured intervertebral disc. He was off work for two years but returned in 1980. In August 1980 he was riding as a passenger in the rear seat of a Greyhound bus which was struck from behind by a truck. His back was reinjured, and he was diagnosed as having degenerative disc disease and lumbrosacral strain.

Medical examinations since 1980 have consistently reported degenerative disc disease with some narrowing of disc space. Almost all examinations have also reported some weakness of dorsiflexion of the right foot. DeLorme was hospitalized repeatedly for pain and back problems.[1] In March 1985, Dr. Vinson, his treating physician, noted a 50–pound lifting limitation and said DeLorme still could not sit any length of time. In April and May 1985 an orthopedic surgeon found a 50% narrowing of the disc space and moderate limitation of motion in the lumbar spine. Although surgery was considered at one time, his doctors found it was not indicated[2] and treated him with physical therapy, muscle relaxants, and pain medication; exercise and retraining, rather than surgery, were emphasized in 1985. In July 1985 records show that DeLorme reinjured his back, was given a cane, and continued physical therapy.

DeLorme had also been treated for depression during this period. The first comprehensive evaluation of his mental state which appears in the record took place in 1986.[3] This psychological assessment by

1. He was hospitalized following the bus accident in August 1980; readmitted for back pain in September 1980, when he was treated with pelvic traction; readmitted for pain and depression in 1981; and readmitted for severe radiating pain to the right hip or right leg in July 1982. In December 1984, less than three months after his insured status expired, he was hospitalized for nine days with severe back pain. His attending physician described DeLorme as "a 46–year–old man in acute pain, abnormal gait with bent position of the spine and straightening out of the lumbar curve." Exhibit 26, Discharge Report by Dr. Vinson. He was again readmitted in 1985 after injuring his back when bending to pick up keys.

2. Dr. Friedman, who had initially proposed surgery when DeLorme was hospitalized in 1980, later found that his myelogram was "relatively unimpressive" and stated that disc removal would be "somewhat premature at this point and we would be unable to offer him any reasonable predicability [sic] in relief of pain."

3. Evidence of any psychological assessments performed in conjunction with his 1981 hospitalization for depression and dissociative state are not in the record. Also, there is nothing in

Dr. Groberg found severe depression based on his inability to work. His psychological test scores indicated a "profound and suicidal depression." He was limited in daily activities in both occupational and social spheres, and could not relate to others other than as an invalid who had lost his capacity to be a productive citizen. The psychologist concluded DeLorme suffered from: "a long term functional nonpsychotic [disorder] manifested by persistent depressive affect with suicidal preoccupation, sleep and eating disturbance and weight loss. Because of this persistent [disorder], he is unable to work or to function effectively in interpersonal relationships."

However, the only accounts of his depression from before 1986 appear in the records of the physicians who treated him for his back problems. Dr. Vinson noted depression as early as 1977 and noted that DeLorme was hospitalized in February 1981 because of depression with "dissociative state." He was discharged to continue with both physical therapy and psychiatric counseling. DeLorme appears to have continued in psychotherapy until November 1981.[4] Depression was repeatedly noted by his physicians;[5] however, there are no psychiatric or psychological evaluations in the record until the exam in 1986.

DeLorme attended vocational training in traffic and transportation management from 1982–1983. In 1985 he began training in business machine repair. At the hearing, he described commuting 50 miles each way to school, sharing driving so that he did not drive the entire distance. The school had installed a turntable at his workstation so that he could turn machines which would be too heavy for him to lift independently. Because he could not perform necessary lifting, he did not expect to be able to work in this field. He began the training through a vocational rehabilitation program because he believed it was a career he could undertake; however, he continued because it helped his mental disposition.

DeLorme first applied for benefits in 1982; that application was denied. His insured status expired September 30, 1984. His second application, in October 1984, was denied later that month. DeLorme did not appeal either of these denials; however, the Secretary has since withdrawn the defense of administrative res judicata.[6] The current application was filed in August 1985 and denied in September 1985.

In July 1986, a hearing was held before an administrative law judge on DeLorme's application for benefits. DeLorme submitted medical records from physicians who had treated him or examined him in regard to his back injury and subsequent pain, and the psychiatric assessment performed in 1986. He testified regarding his medical history and his present limitations. He testified that he had a twenty-five-pound weight restriction on lifting, and that he could sit in one position no more than thirty to forty-five minutes. On further questioning, he said he was capable of alternately sitting and standing for up to

the record showing assessments by any psychologists or psychiatrists who treated him over the years between 1977 and 1986, even though the records of the physicians who treated him for back trouble indicate that he did receive psychological therapy as well during this period.

4. Dr. Quintero, the neurologist who examined DeLorme at the request of the Secretary, notes DeLorme's statement that he had been in psychotherapy during this period.

5. Dr. Vinson noted in November 1981 that he was encouraged by some improvement in DeLorme's mental outlook (apparently, according to other records, subsequent to extended treatment by a psychiatrist); however, this is the only time one of his physicians noted any improvement, and it was followed by Dr. Vinson's observation in 1982 that DeLorme had "many indications for depression secondary to the back injury and chronic pain." In June 1984, DeLorme told Dr. Vinson that he had been depressed for one and a half months. Also in 1984, Dr. Shafter noted that DeLorme appeared depressed and had an erectile dysfunction secondary to depression. In July 1985, he was treated with Elavil for depression; Elavil had been listed among his medications in 1982 and 1984 as well. In August 1985, a consultant's report described him as "sullen."

6. At the hearing before the magistrate, the Secretary waived this defense.

approximately one hour.[7] DeLorme also testified that he had used a cane since 1983, and that he wore a lumbar brace prescribed by several doctors, including Dr. Friedman, whom he had seen at the time he was injured. He also mentioned some loss of dexterity in his fingers, which had been found in testing in 1982. However, no such tests are in the record, and the only reference to such problems in the records came when he told one doctor that he had formerly had some numbness in his fingers which had since improved.

A vocational expert testified regarding DeLorme's capacity to work. The ALJ posed the following hypothetical for the vocational expert:

Considering the Exhibits and the testimony and considering that Mr. DeLorme can lift no more than 25 pounds—can sit at one time no longer than 45 minutes, can walk no longer than 45 minutes and cannot walk on rock or extruded ground and must use at least for an extensive walking a prosthesis or a walking stick. Also considering a background of high school plus two years of college in traffic management and one year in business systems repair. And considering the medical disability.... Would there be any positions in the economy that would be available in work that he could do?

The vocational expert said he had "found one sedentary job in a related area that I could consider," and described the position of "taxicab starter" (dispatcher). There were less than five such positions in the metropolitan area and four to five thousand such positions in the national economy. The taxicab starter position was sedentary and met the specified limitations on lifting. On further questioning by DeLorme's attorney, however, the expert said it would be "very difficult" for DeLorme to work at this position. His references to

the hypothetical demonstrated some uncertainty regarding DeLorme's limitations;[8] however, he emphasized the limitations imposed by the need to alternately sit and stand.

When asked about additional positions which might be possible for DeLorme, the vocational expert stated that the position of cashier was sedentary in nature, but that he was unsure of its suitability because DeLorme required "a lot of leeway ... to stand up from the job and walk around.... [T]here are many cashier positions where they are not allowed that freedom—to stand and sit. That would limit it." Although there were many cashier jobs in the national economy, there were only three to four hundred such positions in the area of Idaho where DeLorme lived, a number which would be additionally limited by DeLorme's restrictions on standing and sitting to "a much smaller [number] ... really not very many, in my opinion." Further questions by DeLorme's attorney focused on difficulties with manual dexterity, which had not been part of the ALJ's hypothetical. The vocational expert testified that this would also make it extremely difficult for DeLorme to perform a cashier's work.

The ALJ found that DeLorme was not disabled. He summarized part of DeLorme's testimony regarding his training program incorrectly, stating that claimant "anticipates completing course work in the near future in electronics and expects to find employment, although he has difficulty because of his limitations." The ALJ noted DeLorme's testimony indicated he could not lift objects heavier than 20 pounds or stand longer than an hour; however, because of DeLorme's ability to continue the business machine training program, the ALJ concluded he could perform a wide range of sedentary work.[9] He found DeLorme's impairments were not

---

**7.** Q: How long do you have to get up and move about before you sit down for that length of time again?
A: About the same. They are pretty equal.
Q: Say, an hour or forty-five minutes and sit down that long?
A: Yes.

**8.** The vocational expert said: "[T]hat particular job ... is listed as sedentary. There are some restrictions in reaching and in fingering and in feeling. There is a question in my mind as to whether you spoke to that issue and about that p[a]rticular job. But, it is sedentary."

**9.** The ALJ stated: "[I]n light of his testimony concerning his ability to commute to school,

equal to any listed in the Listing of Impairments; that the objective findings [10] did not "contra-indicate alternate sitting and standing, with lifting and carrying of objects no heavier than 10 pounds"; and that DeLorme had the residual functional capacity (RFC) to perform the physical exertion and nonexertional requirements of work except for "those set forth above." [11] Based on DeLorme's exertional capacity for sedentary work, the Medical–Vocational guidelines would direct a conclusion of "not disabled." Although DeLorme had additional nonexertional limitations (apparently, pain) which did not allow him to perform the full range of "sedentary" work, there were "a significant number of jobs in the national economy which he could perform [such as] cab starter or cashier. Such jobs exist in significant numbers in the region in which claimant lives in the national economy."

The Appeals Council affirmed in February 1987. DeLorme filed an action seeking reversal in district court in April 1987; in July 1989, the district court entered judgment for the Secretary. DeLorme timely appealed.

## II. STANDARD OF REVIEW

This court reviews de novo the district court's grant of summary judgment for the

Secretary. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.1989). We review the ALJ's determination that DeLorme was not disabled to determine whether it was supported by substantial evidence and whether it was based on the proper legal standard. *Stewart v. Sullivan*, 881 F.2d 740, 743 (9th Cir.1989); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.1989). As a reviewing court, we must review the record as a whole and consider adverse as well as supporting evidence. We "may not affirm simply by isolating a specific quantum of supporting evidence." *Hammock*, 879 F.2d at 501 (quoting *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir.1985)).

## III. DELORME'S BACK INJURY

■ DeLorme first asserts that he should have been found, as a matter of law, to meet the criteria establishing disability under the Listing of Impairments in 20 C.F.R. Part 404, Subpt. P, App. 1.[12] There is no dispute that DeLorme suffered from pain and muscle spasm for a period of years, or that he suffers from degenerative disc disease. Doctors also repeatedly noted radicular pain. However, an independent review of the record does not clearly

---

**10.** The ALJ couched these findings in terms of the credibility of DeLorme's description of his symptoms: "Claimants [sic] objective complaints and allegations are not so credible or corroborated by medical findings and opinions pertinent to the period here at issue as to contra-indicate alternate sitting and standing, with lifting and carrying of objects no heavier than 10 pounds." This is not actually a challenge to the credibility of DeLorme's testimony regarding his condition. In fact, the 10-pound limit found by the ALJ in these conclusions is *more* restrictive than the 25-pound limit the ALJ had included in the hypothetical given to the vocational expert. Medical evidence supports the restrictions on lifting and alternate sitting and standing in the ALJ's hypothetical. Therefore, despite the choice of terminology, this finding does not actually involve the credibility of DeLorme's pain testimony at all.

undertake successfully a course of study, alternately sit, stand, lift, and handle objects less than 20 pounds, the undersigned finds it reasonable to conclude the claimant would not be foreclosed from a wide range of at least 'sedentary' work."

**11.** In apparently contradictory findings, the ALJ held that DeLorme's residual functional capacity was "reduced by no persistent restriction of his abilities to perform nonexertional work-related functions prior to the expiration of his insured status" but that "additional nonexertional limitations" made it impossible for him to perform "the full range of 'sedentary' work." The magistrate later held that the first finding referred to DeLorme's depression, the second to his "other nonexertional limitations (*i.e.*, pain) which would limit him from performing a full range of sedentary work...."

**12.** § 1.05 C requires:

Other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

1. Pain, muscle spasm, and significant limitation of motion in the spine; and

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

demonstrate a twelve-month period during which DeLorme experienced a significant limitation of motion in the spine.[13] Therefore, there is no twelve-month period in the record during which all the criteria in the Listing of Impairments are met. Dr. Quintero, who examined him for the Secretary, found a full range of motion in 1982; this finding interrupted the period during which other doctors had noted a limited range of motion. Although the treating physician's opinion is generally given greater weight, the non-treating physician's opinion provides substantial evidence on which the ALJ may rely when it is based on independent clinical findings. *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985). Therefore, DeLorme cannot establish disability because of his back problem based on the criteria given in the Listing of Impairments.

## IV. DELORME'S DEPRESSION

■ DeLorme also contends that he should have been found disabled under the criteria in the Listing of Impairments on the basis of his depression.[14] The psychol-

ogist's report on DeLorme from 1986 appears to show that these criteria have been met, although the findings regarding daily life and social interaction are not specific. Of the symptoms in the first group, the psychologist reported appetite disturbance, sleep disturbance, and suicidal preoccupation. The psychiatrist also described "feelings of hopelessness and depression, and he cannot relate to others other than as an invalid who has lost his ability to be a productive citizen." This description would seem to indicate that, as of 1986, DeLorme experienced "feelings of guilt and worthlessness," which would meet the first set of criteria in the Listing of Impairments. Finally, the psychiatrist described DeLorme as suffering from a *"long term* functional nonpsychotic disorder" and found that he was "unable to work or to function effectively in interpersonal relationships."

Based on the findings in the 1986 psychiatrist's report, DeLorme would have met the criteria set forth in the Listing of Impairments, depending on the duration of his mental problems. In *Villa v. Heckler*, 797 F.2d 794, 797 (9th Cir.1986), similar though

---

**13.** Findings of restriction of back movement in August 1980 were followed by a "fair range of back movement" in September 1980; doctors failed to note restricted back movement again until July and November 1982. In September 1982, however, DeLorme had been examined by Dr. Quintero, a neurologist, at the request of the Secretary. Dr. Quintero found a full range of motion in DeLorme's spine. In 1984, during the next exam in the record, Dr. Vinson noted that DeLorme was having spasms in his back but did not mention any limitation of motion. In October 1984, just after DeLorme's insured status expired, another physician found a limited range of motion: DeLorme could "bend forward only to the point where he gets his wrist crease to the superior patellar margin without pain."

**14.** 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04, *Affective Disorders,* describes these disorders as "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. *Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." Id.* (emphasis added). An individual is defined as disabled if he manifests

[m]edically documented persistence, *either continuous or intermittent,* of one of the following:

1. Depressive syndrome characterized by at least four of the following:
 a. Anhedonia or pervasive loss of interest in almost all activities; or
 b. Appetite disturbance with change in weight; or
 c. Sleep disturbance; or
 e. Decreased energy; or
 f. Feelings of guilt or worthlessness; or
 g. Difficulty concentrating or thinking; or
 h. Thoughts of suicide ...

*Id.* § 12.04 A. The required level of severity for these disorders is present if these result in at least two of the following:
 1. Marked restriction of activities of daily living; or
 2. Marked difficulties in maintaining social functioning; or
 3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
 4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

*Id.* § 12.04 B.

more detailed findings (including inability to relate effectively with other people in a work setting because of depression) were the basis of a determination of disability. The brief notes made by physicians treating him for his back problems, however, do not establish how extensive or how continuous his mental symptoms were during the years of his insured status. The ALJ's review summarizing the psychiatric evaluation noted three characteristics of depressive syndrome but failed to note evidence of "feelings of guilt or worthlessness." [15]

Two Social Security Rulings require that relevant psychiatric records be obtained before inferences are made regarding the extent of DeLorme's depression during these years. If the "profound" and suicidal depression documented in 1986 had an onset date more than 12 months before his insured status expired, DeLorme might have established disability. Social Security Ruling [SSR] 83–20 sets forth guidelines for determining the date of onset of a disability and requires that all relevant medical records be obtained for determining onset date.[16]

In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83–20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination. If

medical evidence is not available, then lay evidence may be obtained.

With regard to previously hospitalized mental patients, SSR 83–20 states:

> The medical history in a hospital report ... may describe an onset of pronounced mental symptoms at some time prior to admission to the hospital. The history may present significant information about the individual's condition prior to admission. Depending on the nature of events leading to institutionalization, onset of disability may sometimes be found at a time considerably in advance of admission. It is not unusual for the history to show that prior to hospitalization the person manifested personality changes such as refusing to go out of the house, refusing to eat, accusing others of being against him or her, threatening family and neighbors, etc. In such a case, a beginning date prior to hospitalization would be reasonable unless contradicted by the work history or other evidence.

SSR 83–20, *reprinted in* 2 *Social Security Claims: Practice and Procedure* Section 21.92 (Callaghan 1988). The requirements of SSR 83–20 are further reinforced by the guidelines for determining residual functional capacity given in SSR 83–15, Evaluation of Chronic Mental Impairments, which make it mandatory for the administrative law judge to gather all records of past treatment.[17]

---

**15.** The ALJ also recorded DeLorme's restriction in activities of daily living and maintaining social functioning as "slight," and his deficiencies of concentration as occurring "seldom." These appear to have been based on Dr. Groberg's report, which had stated that DeLorme was unable to work or function in relationships; however this apparently contradictory summary may have resulted from the attempt to assess the period of DeLorme's insured status based only on the 1986 report, which contained no information about DeLorme's earlier mental condition.

**16.** SSR 83–20 states in relevant part:

> 3. Medical and Other Evidence
> Medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability. The medical evidence serves as the primary element in the onset determination. Reports from all medical sources (e.g., physicians, hospitals, and government agencies)

which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling.

**17.** This ruling "explains the considerations that are of special importance in the evaluation of mental disorders that have persisted over an extended period of time," and states:

> The adjudicator must be alert to the particular problems that are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and high dosages of drugs. A single current examination may not always properly describe an individual's sustained ability to function. It should be viewed as one point in time in the longitudinal picture of an individual impairment. It is vital to review all pertinent information describing the individual's impairment. *It is mandatory to attempt to obtain adequate descriptive infor-*

■ These requirements are of particular importance to DeLorme's claim. Since the Secretary has waived administrative res judicata, the entire period from De-Lorme's first application for benefits can be considered. Depression was repeatedly noted in DeLorme's medical records, and Elavil was repeatedly listed among his medications. The records of the doctors who treated his back injury show the likely existence of records from the psychiatrists who attended him during his hospitalization for mental problems and his subsequent psychotherapy.

■ There are two different ways in which these rulings may be relevant to DeLorme. First, he may be able to show that he was depressed for twelve continuous months in the early 1980s, depending on the severity of his depression during this period. Dr. Vinson noted depression in September 1980. DeLorme's hospitalization in November to December 1980 contains no reference to depression; however, he was again hospitalized in February 1981 for depression with dissociative state. The records of his psychotherapy from February to November 1981 might demonstrate disabling depression during this period. If his February 1981 psychiatric records show an onset date at an earlier time, DeLorme may be able to prove that he met the criteria of the Listing of Impairments for mental impairment for twelve continuous months, thereby establishing his disability. It is also possible that the depression diagnosed in 1986 might be found to have an onset date at some other time prior to the expiration of insured status. Second, even if DeLorme's depression did not meet the criteria in the Listing of Impairments, an accurate assessment of his residual functional capacity during the period of his insured status is necessary to pose an adequate hypothetical for the vocational expert.

■ The ALJ has a duty to develop the record in Social Security cases. *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983). This duty exists even when the claimant is represented by counsel. *Id.* Disability hearings are not adversarial in nature. *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir.1987) (ALJ has basic duty to "inform himself about facts relevant to his decision") (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n. 1, 103 S.Ct. 1952, 1959 n. 1, 76 L.Ed.2d 66 (1983) (Brennan, J., concurring)); *see also Brown v. Heckler*, 713 F.2d at 443.

In cases of mental impairments, this duty is especially important. "Because mentally ill persons may not be capable of protecting themselves from possible loss of benefits by furnishing necessary evidence concerning onset, development should be undertaken in such cases to ascertain the onset date of the incapacitating impairment." SSR 83–20, *supra.* Since the Secretary has waived the res judicata effect of prior denials, on remand the administrative law judge should fully develop the record, paying particular attention to whether De-Lorme suffered from low self-esteem and feelings of guilt and worthlessness during this period, and on the impact of his depression on his ability to work during the period of his insured status.[18]

## V. JOBS IN THE NATIONAL ECONOMY

■ A claimant establishes a prima facie case of disability by showing that his

---

mation *from all the sources (both inpatient and outpatient) that are treating the individual currently, as well as those in the past, in order to properly evaluate the severity of the impairment and, when necessary, to arrive at a realistic assessment of residual functional capacity (RFC) over the time required for the decision.* Special efforts *must* be made to obtain adequate evidence from ... pertinent sources that have treated the individual in the past....
SSR 83–15, *reprinted in* 2 *Social Security Claims: Practice and Procedure* Section 21.87 (Callaghan 1988) (emphasis added).

18. DeLorme stated that he continued with his vocational training because it helped his "mental outlook." SSR 83–15 warns that caution is required in evaluating the participation by people with mental impairments in work or training programs; participation in these programs should not be relied upon as evidence that the person is not disabled by the mental impairment. Rather, the person's entire situation and the nature of their activities should be evaluated. SSR 83–15, *supra.*

impairments prevent him from doing his previous job. *Gamer v. Secretary of Health & Human Services,* 815 F.2d 1275, 1278 (9th Cir.1987) (citing *Gallant v. Heckler,* 753 F.2d 1450, 1452 (9th Cir.1984)). The burden then shifts to the Secretary to show that the claimant can do other substantial gainful activity considering his age, education, and work experience. *Gamer,* 815 F.2d at 1278; *Gallant,* 753 F.2d at 1456. In order to meet this burden, when a claimant must alternate periods of sitting and standing, the ALJ is directed to consult a vocational expert. *Gallant,* 753 F.2d at 1457 (citing SSR 83–12). The ALJ poses a hypothetical for the vocational expert which must outline the limitations of the particular claimant. *Id.*

 All parties agree, and the ALJ found, that DeLorme cannot perform his previous job. The ALJ appropriately consulted a vocational expert regarding jobs DeLorme could perform. However, the hypothetical did not include any description of DeLorme's depression, which may prove a significant limitation when the record is developed. Also, when the vocational expert described confusion over whether the hypothetical included restrictions on reaching and fingering, the ALJ did not clarify the hypothetical to exclude these limitations. In fact, since there are only passing references in the record to intermittent difficulties such as numbness in the fingers, there is substantial evidence to support excluding these considerations from the hypothetical. However, the failure to clarify DeLorme's limitations left the vocational expert's testimony couched in somewhat ambiguous terms.

If the hypothetical does not reflect all the claimant's limitations, we have held that the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy. *Embrey v. Bowen,* 849 F.2d 418, 423 (9th Cir.1988); *Gallant,* 753 F.2d at 1457. In this case, the failure to include the mental impairment would of itself require remand for reconsideration after the record is developed. *Embrey,* 849 F.2d at 423.

 In most cases the only issue in evaluating the claimant's appeal is the claimed overly restrictive nature of hypotheticals which do not sufficiently describe the claimant's limitations. *See, e.g., Gallant; Embrey.* Here, however, because of the confusion over DeLorme's physical restrictions, the magistrate and the appeals council felt that the hypothetical had actually given too *much* leeway in describing DeLorme's limitations. As long as the hypothetical was supported by substantial evidence, the Secretary should not be able to argue later that the hypothetical gave too liberal a description of the claimant's limitations. It is the Secretary's burden at this point to show that there are jobs in the national economy, *Gamer,* and to allow later *narrowing* of a description which was supported by substantial evidence would be to undo this process entirely. In this case, since DeLorme had testified that he had used a cane since 1983, the ALJ could treat this testimony as credible and refer to a cane in his hypothetical. In other respects, the hypothetical, though somewhat vaguely phrased ("and considering the medical disability"), is supported by substantial evidence in the record. It is not clear whether the magistrate or appeals council discounted the testimony of the vocational expert based on their belief that the hypothetical had given too much leeway, but if they did, the Secretary would have failed to meet his burden of showing jobs in the national economy which DeLorme could perform.

There is an additional dispute regarding the testimony of the vocational expert. DeLorme argues on appeal that the vocational expert actually held that there were *not* jobs in the national economy which he could perform. The vocational expert named only two jobs, taxicab dispatcher (four or five positions in the area where DeLorme lived, and four to five thousand in the national economy), and cashier (hundreds of thousands in the national economy, hundreds in the area where DeLorme lived). However, DeLorme's impairments affected his ability to perform these jobs. Although the taxicab starter position was sedentary and met the limitations on lift-

ing, the expert said it would be "very difficult" for DeLorme because of both restrictions on reaching and fingering, and, with somewhat greater emphasis, restrictions on sitting and standing. Regarding the position of cashier, the vocational expert stated that few such positions would give DeLorme the requisite leeway to alternately stand and sit. The three to four hundred such positions in the area of Idaho where DeLorme lived would be additionally limited by DeLorme's restrictions on standing and sitting to "a much smaller [number] ... really not very many, in my opinion."

In *Walker v. Mathews*, 546 F.2d 814 (9th Cir.1976), the vocational expert had testified that two jobs were open to an individual with the claimant's capacities. One was very rare, and the claimant's "future in [the other job] is limited to finding one of the few [such] jobs that allow him to sit and stand at will." *Id.* at 820. We held that "[i]n looking toward the pool of jobs existing in the national economy, Congress did not intend to foreclose a claimant from disability benefits on the basis of the existence of a few isolated jobs." *Id.* at 819. On the other hand, when vocational experts identify several job categories and thousands of jobs performable in the state by the claimant, we have repeatedly found substantial evidence of performable jobs. *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir.1989); *Martinez v. Heckler*, 807 F.2d 771, 775 (9th Cir.1986).

Here, the position of taxicab starter is comparable to the "rare" position of carton stenciling in *Walker*, 546 F.2d at 820. The position of cashier may be more widely available than the machine packaging job with similar standing and sitting limitations in *Walker*, although the vocational expert's testimony tends to show that DeLorme can hold "very few" such jobs because of his limitations. The confusion regarding DeLorme's limitations makes it difficult to evaluate the vocational expert's testimony regarding the availability of jobs suitable for DeLorme.

On remand, since the res judicata of earlier decisions has been waived, the ALJ must fully develop the record regarding DeLorme's mental and physical impairments. If DeLorme met the criteria of the Listing of Impairments regarding mental impairments during the period of his insured status, he has established his disability. *Fanning v. Bowen*, 827 F.2d 631, 634 (9th Cir.1987). If he does not meet these criteria, his residual functional capacity during this period should be determined. The hypothetical posed for the vocational expert must then fully reflect all the limitations on DeLorme's activity, including his mental condition.

REVERSED AND REMANDED.