945 F.2d 409
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Melva L. IMBERT, Plaintiff-Appellant
v.
Louis W. SULLIVAN, M.D., Secretary of Health and Human
Services, Defendant-Appellee
 No. 90-35613.
 United States Court of Appeals, Ninth Circuit.
 Submitted July 16, 1991.*
Decided Oct. 1, 1991.
 
 Before KILKENNY, SNEED and FERGUSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Plaintiff Melva Imbert appeals the district court's judgment affirming the Secretary of Health and Human Services' ("Secretary") denial of her application for disability benefits under Title II of the Social Security Act. Imbert contends that:
 
 
 3
 (1) substantial evidence did not support the Secretary's finding that she was not disabled by epilepsy, (2) the administrative law judge ("ALJ") erred by ignoring evidence of mental impairment and refusing to order a psychiatric examination, and (3) the transcript of the hearing before the ALJ was inadequate. We have jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291, and reverse.[1]
 
 I.
 
 4
 Melva Imbert is a 50-year old woman who has been afflicted with seizures since infancy. Additionally, she suffers from psychological problems which appear to be related to her seizures. Imbert was last insured for disability purposes as of March 31, 1978. Her last sustained period of employment ended on October 31, 1976.
 
 
 5
 Melva Imbert applied for disability benefits on October 22, 1986, alleging that she became disabled on October 31, 1976. Her application was denied initially and on reconsideration. At the subsequent hearing before the ALJ on January 26, 1988, Imbert and lay witnesses Annette Wright, Norma Funke, and Elwood Joy testified, and the ALJ admitted the medical records of Imbert's doctors and the statements of several friends, relatives and former employers. The ALJ determined that Imbert was "relatively seizure-free" for approximately ten years prior to late 1981 or early 1982. He based his finding on statements from three doctors, Drs. Jones, Deal and Dewey, none of whom had seen Imbert during her period of entitlement. The ALJ did not explain why he rejected the statements provided by other doctors, including those who treated Imbert during her period of insurance coverage, for example, Drs. Ballhagen and McDonald. The ALJ concluded that Imbert did not become disabled between October 31, 1976, the date she stopped working, and March 31, 1978, the date she was last insured for disability benefits, because her epileptic seizures did not meet a listed impairment and did not prevent her from performing her past work. The Appeals Council denied Imbert's request for review on December 6, 1988.
 
 
 6
 Imbert filed a complaint in the district court on January 25, 1989, and the district court affirmed the Secretary's decision on July 2, 1990. Imbert timely appeals.
 
 
 7
 The evidence presented to the Secretary illustrates Melva Imbert's long and complicated medical history of epileptic seizures and emotional difficulties. In June 1957, Dr. Forbeck diagnosed a psychomotor convulsive disorder and prescribed Mysoline and Diamox. Record 179. He also detailed the history of her seizures and reported an abnormal EEG. Record 180-81. In June 1967, Dr. Norman wrote to Dr. Deal, Imbert's treating physician, reporting an increase in Imbert's seizures and recommending a change in her medication, in addition an EEG report indicates "abnormal waking record." Record 183-84. In January 1968, Dr. Norman again saw Imbert. He reported to Dr. Deal that her seizures had recently required hospitalization, although they had decreased overall. Record 185.
 
 
 8
 In 1972, Dr. Deal reported to the Social Security Administration that Imbert's psychomotor seizures prevented her from employment. Record 188. Throughout the 1970's, Imbert was seen by Drs. Deal, Coriell, and Lanes. Their offices have attempted to transcribe the doctors' notes of Imbert's visits during this time. Record 191-92. Such notes refer to seizures in June 1975, October 1975, and June 1979.
 
 
 9
 Dr. Jones was a neurologist who saw Imbert on three different occasions on a consultative basis. He first saw Imbert in 1972. At this time, Dr. Jones noted her history of seizures and found an abnormal pattern in her sleeping EEG. Record 132. He concluded that Imbert had psychomotor seizures which were confirmed by the EEG. Record 134. In addition, he noted that she had numerous emotional symptoms, and had had a psychiatric evaluation. He saw her a second time, approximately one year later. At this time, he reported that Imbert was still experiencing seizures, primarily nocturnal, with "no significant reduction" from the previous year. Record 137. He also noted, "[t]he patient's principle [sic] complaint now seems to be that of fatigue. Also she states she can't be around people because it makes her so extremely nervous and she can't do anything right. She states this is the primary reason why she can't work." Id. Finally, he concluded that "[f]rom a physical standpoint, I believe this patient could be gainfully employed." Record 138 (emphasis added). The last time Dr. Jones saw Melva Imbert was in 1982.[2]
 
 
 10
 From the late 1970s through the 1980s, Imbert was also treated by Drs. Ballhagen and McDonald. Record 151-54. Their notes refer to her seizures on June 7, 1977, January 24, 1978, April 30, 1982, July 9, 1982, March 14, 1983, July 15, 1986, October 20, 1986, and October 27, 1986. In addition, there are numerous references to her problems with depression and anxiety. See id. In 1986, Dr. Ballhagen reported increased seizures and emotional problems. Record 217. At that time, he referred Imbert for psychological treatment. He also referred her to Dr. Dewey, a neurosurgeon, for her seizures. In September 1986, Dr. Dewey reported her seizures were occurring approximately two times a week. Record 147. A CT scan was interpreted by Dr. Dewey to be consistent with an old brain injury. Record 149.
 
 
 11
 Imbert began seeing psychologist R.A. Shea in November 1986. Finally, in December of 1986, she was referred to Dr. Cooney, a neurologist. His reports describing his treatment of Imbert through 1987 consistently noted that her seizures occurred approximately once a week. He also referred to her emotional difficulties. Record 247-50.
 
 
 12
 Imbert's work history reflects a succession of short-term jobs which required little skill. From 1972 to April 1974, she did cooking, cleaning, and child care at a day care center. Record 123. From April 9, 1974, to October 18, 1976, she worked at the Polson Senior Citizens Center in some unspecified capacity. In 1979, she attempted to work as a salad bar attendant. Record 163. In 1980, she worked briefly as a cafe waitress. Record 114. She was a baker's assistant and waitress at the Lake City Bakery from November 1982 to May 1983. Record 114, 31-32, 44-46. Finally, in October 1983, she attempted to work as a checker at a convenience store. Record 130-31.
 
 II.
 
 13
 This court must affirm the Secretary's denial of disability benefits if substantial evidence in the record as a whole supported his findings of fact and he applied correct legal standards. 42 U.S.C. § 405(g); Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir.1989). Evidence is substantial if a reasonable mind might find it adequate to support the Secretary's determination. Id. Although deferential to the agency, the substantial evidence standard requires the appellate court to review the administrative record as a whole, weighing both the evidence that supports the agency's determination as well as the evidence that detracts from it. DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir.1991); Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir.1988).
 
 III.
 
 14
 On appeal, Imbert contends that the Secretary wrongly found that she was not disabled during her period of entitlement, 1976-1978. The parties do not dispute that Imbert has been afflicted by seizures throughout her life. However, the Secretary asserts that Imbert did not establish the necessary severity of seizures to meet the criteria under the Listing of Impairments in 20 C.F.R. Part 404, Subpt. P, App. 1.[3]
 
 
 15
 To be eligible for disability benefits, Imbert must demonstrate she was disabled on or before her last insured date. See 42 U.S.C. § 423(c); 20 C.F.R. § 404.1520. The burden of proof on this issue is on the claimant. See Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1278 (9th Cir.1987). The claimant must demonstrate that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).
 
 
 16
 The ALJ's decision denying Imbert disability benefits relied solely on the statements and records of Drs. Jones, Deal and Dewey. In doing so, he failed to mention the medical statements by numerous others doctors, some of whom had seen Imbert more frequently and nearer to the time during which she was insured. In support of his conclusion, he quoted from the notes of Dr. Jones who saw Imbert in May, 1982.
 
 
 17
 [T]he claimant "evidently had been essentially seizure-free from about 1971 up until the first of the year. Since January (1982) she has been having a seizure at night evidently on the average of about once a month." ... Additionally, Dr. Millerd E. Jones also states [on December 15, 1989] "with the vast majority of her seizures having been nocturnal this would hardly affect her activities during the day to any significant degree, and I would regard her from reading my notes that probably she would have been employable at least in some capacity."
 
 
 18
 Record 12. However, these statements are taken out of context and given much greater weight than is reasonable in light of the fact that Dr. Jones only saw Imbert three times over a 10-year period. The ALJ compounded this error by placing great weight on the contradicted comments of Dr. Jones without mentioning the observations of other physicians who saw Imbert on a more regular and frequent basis.
 
 
 19
 While Imbert's medical history is clearly complicated, the statements relied on by the ALJ are directly contradicted by notes of her treating physicians whom she saw during that time. "When an administrative law judge disregards the opinion of the treating physician, 'he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.' " Stone v. Heckler, 761 F.2d 532-33 (9th Cir.1985) (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983)). Here the ALJ failed to even mention the reports of the numerous other doctors who have treated Imbert. These doctors reported frequent seizures in the period before Imbert's insured status, after her insured status, and during her insured period. See supra, pp. 3-5. Given the overwhelming evidence of her history of frequent, uncontrollable seizures, there is not substantial evidence to support the ALJ's conclusion that Imbert was seizure free from 1971 to 1981.[4]
 
 
 20
 Because the testimony from the doctors was received by the ALJ all in the form of statements or medical reports, the ALJ's decision to rely primarily on only three doctors, ignoring the rest, cannot be based on credibility determinations. The ALJ, in order to enable intelligent review, "must explain why 'significant probative evidence has been rejected.' " Vincent on behalf of Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.1984) (quoting Cotter v. Harris, 642 F.2d 700, 706 (3d Cir.1981)). Here the statements and records of Imbert's treating physicians who saw her numerous times over a period of years are clearly probative in light of contrary statements by specialists which only saw her two or three times, and never during her period of insured status.
 
 
 21
 It is true that during the years from 1976 to 1978, Imbert was not being treated regularly for her seizures. However, this court has previously found that an absence of medical treatment, in the context of a long-term medical impairment, is not conclusive evidence that the impairment ceased to exist. The facts in this case are similar to those in Smith v. Bowen, 849 F.2d 1222 (9th Cir.1988). There the plaintiff had a history of epilepsy, but had little in the way of detailed medical records during his period of entitlement. The Secretary had denied Smith disability benefits on the grounds that his seizures were not frequent enough during his period of entitlement. This court reversed. "We think it is clear that reports containing observations made after the period for disability are relevant to assess the claimant's disability." Id. at 1225 (citing Kemp v. Weinberger, 522 F.2d 967, 969 (9th Cir.1975)). In addition, we found that the absence of medical evidence during this period was not conclusive as to the severity of Smith's seizures. "The absence of references to the seizures does not weigh as heavily as the medical and lay testimony as to their frequency and severity." Id. at 1226.
 
 
 22
 Given the large amount of evidence, both medical and lay, describing Imbert's history of seizures, the Secretary's decision to deny disability benefits, without stating his reasons clearly and fully for failing to discuss this evidence, must be reversed.
 
 IV.
 
 23
 Imbert also contends that the Secretary erred in denying her motion for a consultative examination on the issue of mental disability and in failing to address the evidence she presented in support of her claim of psychiatric impairment. At the hearing, the lay witnesses unanimously agreed that Imbert had had emotional difficulties. Statements from her former employers attested that Imbert was unable to deal with the demands of working. The notes and statements of Drs. Deal, Coriell, Lanes, Ballhagen, Shea and Cooney also contain evidence of long-term psychological problems. Even Dr. Jones noted her depression and numerous emotional symptoms. Record 132.
 
 
 24
 In his decision, the ALJ did not even mention the evidence presented regarding Imbert's mental impairment. The Appeals Council, affirming the ALJ's decision, noted "the record contains no diagnosis of or treatment for any mental problems during the [insured] period." Record 3. However, the significant date for disability compensation is the date of onset of the disability rather than the date of diagnosis. See Swanson v. Secretary of Health and Human Services, 763 F.2d 1061, 1065 (9th Cir.1985); Social Security Rule ("SSR") 83-20, Policy Statement.
 
 
 25
 An ALJ has a special duty in social security cases to fully and fairly develop the record in order to enable an informed decision on the claimant's request for benefits. Brown v. Heckler, 713 F.2d 441, 443 (9th Cir.1983). "This duty exists even when the claimant is represented by counsel." Id. In addition, the ALJ must consider the disabling effects of multiple illnesses in combination. Sprague v. Bowen, 812 F.2d 1226, 1231 (9th Cir.1987); Beecher v. Heckler, 756 F.2d 693, 694-95 (9th Cir.1985). Even if the claimant's symptoms "fail to meet or equal those of a listed mental disorder, the ALJ must consider the effect of her mental state on her physical ability to perform gainful activity." Sprague, 812 F.2d at 1231.
 
 
 26
 Here, a consultative examination would assist the Secretary in developing the evidence regarding Imbert's possible mental disability. An evaluation of her emotional health during her years of entitlement must then be considered in combination with the medical evidence regarding her seizures. The evidence and testimony presented to the Secretary is uncontradicted that Imbert has had long-term emotional problems, probably exacerbated by her epilepsy. "An ALJ must explain why he has rejected uncontroverted medical evidence." Vincent, 739 F.2d at 1395 (citation omitted). In addition, when the lay testimony supports the medical evidence, failure to discuss this testimony is grounds for reversal. Cf. id.
 
 
 27
 REVERSED and REMANDED.
 
 
 
 *
 This panel unanimously agrees that this case is appropriate for submission without oral argument. Fed.R.App.P. 34(a) and 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Because we reverse based on Imbert's first two claims, we do not reach her third claim regarding the hearing transcript
 
 
 [2]
 His statement detailing this visit begins with these observations:
 "I evidently had seen this patient previously in about 1971 and we are endeavoring to locate her old record.... She is a rather poor historian." Record 140. He then states, "[s]he evidently had been essentially seizure free from about 1971 up until the first of the year." Id. However, this observation is clearly in error. It was probably based on Imbert's own recollection.
 
 
 [3]
 The listed impairment which is applicable to Imbert's disability is § 11.03:
 Epilepsy--Minor motor seizures (petit mal, psychomotor, or focal), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.
 
 
 [20]
 C.F.R. Part 404, Subpart P, Appendix 1 § 11.03 (1991) (emphasis in original)
 
 
 [4]
 The ALJ also appeared to rely on the fact that Imbert has a driver's license. However, "[m]ere participation in an activity does not, of itself, reflect upon the degree of impairment severity." Hartman v. Bowen, 134 F.Supp. 129 (N.D.Cal.1986). While Imbert's possession of a driver's license does raise an inference regarding the severity of her seizures, this inference is refuted by the testimony and statements of lay witnesses. Both Floretta Caverly and Barbara Sapp (Imbert's daughter) stated that Imbert's seizures made her too afraid to drive. Record 159-62