959 F.2d 240
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Jerry DURREN, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, M.D., Secretary of Health and Human
Services, Defendant-Appellee.
 No. 90-35822.
 United States Court of Appeals, Ninth Circuit.
 Submitted March 4, 1992.*
Decided April 3, 1992.
 
 Before CYNTHIA HOLCOMB HALL, O'SCANNLAIN and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Durren appeals the denial of Social Security disability benefits. Because the Administrative Law Judge's ("ALJ") finding that Durren is not disabled is supported by substantial evidence in the record, we affirm.
 
 
 3
 * "We review the ALJ's determination that [the claimant] was not disabled to determine whether it was supported by substantial evidence and whether it was based on the proper legal standard." DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir.1991) (citing Stewart v. Sullivan, 881 F.2d 740, 743 (9th Cir.1989) and Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir.1989)). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Barker v. Secretary of Health and Human Servs., 882 F.2d 1474, 1476 (9th Cir.1989) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).
 
 II
 
 4
 Durren contends that the ALJ disregarded the opinion of his treating physician when the ALJ ruled that Durren's stroke had not left him disabled. It is not readily apparent, however, just what the opinion of the treating physician was in this case. Durren was treated by more than one doctor following his release from the hospital, and the doctors did not agree on Durren's prognosis. Dr. Hoeflich consistently reported that Durren was "making a nice recovery." In February 1988, two months after the stroke, she stated that she planned to discuss with Durren his "return to work ... in light of his recovery," in April she discussed with Durren plans to return to work in July and "how to handle the pressure of the emotional lability when he returns to work," and in August she stated that Durren had "retired from his position at Boeing, which considering how technical and precise his work was is probably the best decision." Apparently, then, Dr. Hoeflich believed that Durren could return to work, although perhaps not to his former job as a machinist.
 
 
 5
 Dr. Duris, by contrast, stated that Durren was not "a suitable candidate for job retraining or rehabilitation." Not only were Drs. Hoeflich and Duris inconsistent, but Dr. Duris's opinion varied. In April 1988, Dr. Duris stated that Durren "continue[d] to show good progress" and that Durren could soon return to part time work. In May 1988, Dr. Duris reported that Durren was "feeling very good and improving strength on an almost daily basis." In June, however, Dr. Duris stated that the stroke would "make it impossible for [Durren] to continue at his former occupation." This same month, Dr. Duris wrote a "to whom it may concern" letter in which he went much farther, making the categorical statement that "there is no way that [Durren] will be able to return to gainful employment." Yet in July, Dr. Duris retreated to the narrower view that Durren could not return merely to his machinist job. Thus, because Durren's treating physicians did not speak with one voice, and because Dr. Duris's views varied based on the time and setting, it is hard to say exactly what the opinion of the treating physician was here.
 
 
 6
 Nonetheless, granting that the ALJ's determination that Durren could work as a security guard appears to conflict with the views expressed in Dr. Duris's June 1988 letter (although not with any other statements of Dr. Duris, nor with Dr. Hoeflich's opinion), we are satisfied that the ALJ's findings are supported by substantial evidence. Under circuit law, "when another doctor's opinion contradicts the opinion of a treating physician, an ALJ can disregard the latter only by articulating 'specific, legitimate reasons for doing so that are based on substantial evidence in the record.' " Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir.1991) (quoting Magallanes, 881 F.2d at 751). "This burden can be met by providing a detailed summary of the facts and conflicting clinical evidence, along with a reasoned interpretation thereof." Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir.1989). This is just what the ALJ has done here, thoroughly discussing the findings of each of the physicians and the testimony of Durren himself.
 
 
 7
 The ALJ never expressly stated why he was only accepting part of Dr. Duris's views and not following the opinion expressed in the June 1988 letter, but such a statement is not always necessary. In a similar situation, we stated:
 
 
 8
 It is true that the ALJ did not recite the magic words, "I reject Dr. Fox's opinion about the onset date because...." But our cases do not require such an incantation. As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion.
 
 
 9
 Magallanes, 881 F.2d at 755. We infer that the ALJ chose to disregard the June 1988 letter because it was unsupported by medical findings, was far broader in scope than any other opinion expressed by Dr. Duris before or after, was inconsistent with the opinion of the other treating physician, Dr. Hoeflich, and was contradicted by Durren's own testimony about his varied daily activities. We conclude that, to the degree that the ALJ's determination of non-disability conflicted with one opinion expressed by one of the treating physicians, the ALJ satisfied our rule that he set forth specific, legitimate reasons for disregarding such an opinion.
 
 III
 
 10
 Durren also contends that the ALJ failed to make sufficient findings regarding Durren's own testimony. Construing the record most generously, Durren could be said to have testified that he had a disabling emotional disorder that would prevent him from working as a security guard.[1] The ALJ found otherwise, stating that Durren's
 
 
 11
 organic mental disorder with mood disturbance and emotional lability has resulted in no restriction of activities of daily living and only slight difficulties in maintaining social functioning. The claimant seldom experiences deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner and has never deteriorated or decompensated in work or work-like settings.
 
 
 12
 "If a claimant submits objective medical findings of an impairment that would normally produce a given symptom, but testifies that he experiences the symptom to a greater degree than would normally be expected, the Secretary may disbelieve that but must make specific findings justifying his decision." Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.1989); accord Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir.1991) (en banc) ("although an adjudicator may find the claimant's allegations of severity to be not credible, the adjudicator must specifically make findings which support this conclusion").
 
 
 13
 Assuming, arguendo, that Durren made his threshold showing of "objective medical findings" supporting his alleged emotional disorder, thus requiring the ALJ to explain why he was not fully crediting Durren's symptom testimony, we are satisfied that the ALJ made sufficient explanation. The ALJ found that Durren's testimony of a disabling emotional disorder was inconsistent with his self-described vigorous daily routine, and accordingly declined to credit fully such testimony. The ALJ stated that Durren's testimony regarding his diminished capabilities "appeared credible to the extent that he is unable to return to his past machine operator work." The ALJ continued: "However, his daily activities and interests are consistent with less demanding work...." The ALJ went on to describe the daily activities to which Durren testified, which ranged from building miniature dollhouses and three-mile walks to delivering meals to shut-ins as a volunteer for Meals on Wheels.
 
 
 14
 We have recently stated that "if the claimant engages in numerous daily activities involving skills that could be transferred to the workplace, an adjudicator may discredit the claimant's allegations upon making specific findings relating to the claimant's daily activities." Bunnell, 947 F.2d at 346. In his Finding Six, the ALJ made such specific findings about Durren's varied daily activities. We conclude that the ALJ made sufficient findings in rejecting part of Durren's testimony.
 
 IV
 
 15
 The ALJ's findings were to some degree inconsistent both with the opinion of one of the treating physicians and the claimant's symptom testimony. The ALJ, however, adequately explained his partial disregard of this evidence, and his determination that Durren is not disabled is supported by substantial evidence.
 
 
 16
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a), Ninth Circuit R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit R. 36-3
 
 
 [1]
 In response to the question whether there was any reason he could not work as a security guard, Durren answered: "Well, the only thing that I can see would keep me back is the tension of being a guard." Later, Durren stated, "I don't feel that I could do the work that I used to do, whether it was a guard or a machinist because the confusion of people and noise in the plant and so on. I have a hard time concentrating on it." Durren also testified to memory lapses and difficulty reading small print, but did not identify these as reasons he could not work as a security guard