

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-20-2001

# Walton v. Apfel

Precedential or Non-Precedential:

Docket 00-1289

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Walton v. Apfel" (2001). *2001 Decisions.* Paper 54.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/54

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 20, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-1289

GEOFFREY WALTON
Appellant

v.

WILLIAM A. HALTER,* Acting Commissioner of Social
Security

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 98-cv-01251)
District Judge: Honorable Lowell A. Reed, Jr .

Argued November 9, 2000

BEFORE: ROTH, McKEE and STAPLETON, Cir cuit Judges

(Opinion Filed March 20, 2001)

Kenneth M. Kapner
1333 Race Street, Suite 205
Philadelphia, PA 19107
 and
Thomas D. Sutton (Argued)
Leventhal & Sutton
One Oxford Valley, Suite 317
Langhorne, PA 19047
 Attorneys for Appellant

_____
* Substituted pursuant to F.R.A.P. 43(c).

Allyson Jozwik (Argued)
David Wiedner
Social Security Administration
SSA/OGC/Region III
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19123
 and
Lori Karimoto
Social Security Administration
OGC/Region III
P.O. Box 41777
Philadelphia, PA 19101
 Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

I.

On August 14, 1992, Geoffrey Walton filed an application for child's disability insurance benefits under the Social Security Act based on his deceased father's employment record. Walton alleged an onset date of disability of June 13, 1966, the day before his twenty-second birthday. Appellee Kenneth Apfel, Commissioner of Social Security ("the Commissioner"), denied the application. Walton then filed the present action in the District Court which granted the Commissioner's motion for summary judgment. Walton appeals.

II.

Section 405(g) of Title 42 of the United States Code authorizes appeals from final decisions rendered by the Commissioner "within sixty days after the mailing to [the applicant] of notice of such decision or within such further time as the Commissioner of Social Security may allow." Shortly before oral argument the Commissioner moved to dismiss this appeal on the ground that Walton's resort to the District Court was untimely, and it, therefore, lacked

jurisdiction. "[T]he 60-day requir ement is not jurisdictional, [however, and] constitutes [only] a period of limitations." Bowen v. City of New York, 476 U.S. 467, 478 (1986). Defenses based on limitations can be waived. Because the Commissioner failed to brief this issue on appeal, the issue is waived. See id.

III.

A.

Walton claims that he is entitled to benefits based on his mental illness, bipolar disorder--manic depr ession. In order to receive benefits, Walton must show, among other things, that he has a disability which began prior to his twenty-second birthday. See 20 C.F.R. S 404.350. A "disability" is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. S 404.1505(a). To meet this definition, claimants "must have a severe impairment, which makes[them] unable to do [their] previous work or any other substantial gainful activity which exists in the national economy." Id.

Walton, who is presently disabled and r eceiving Supplemental Security Income Disability Benefits, has a long history of suicide attempts, hospitalization, and treatments by a series of psychiatrists. He wasfirst diagnosed as having bipolar-manic depr ession in 1971 when he was twenty-six years of age, and the contemporaneous medical records fr om the period after that date are extensive. While the contemporary medical records from the preceding period are considerably more limited, they do bear evidence that Walton's mental impairment originated prior to 1971. The ALJ was thus confronted in 1994 with the difficult task of determining whether Walton's progressive mental impairment rose to the level of a disability prior to his twenty-second birthday on June 13, 1966.

3

Walton testified that he attended Trinity College in Connecticut from 1962 until June of 1964, when he was asked to leave and withdrew. He returned to Trinity in 1965, but again found himself on academic probation in February, 1966, when he again withdrew. After dropping out the first time, Walton saw a psychiatrist, Dr. Howard Wood, weekly. Walton had his first manic experience in the summer of 1965 and saw a psychiatrist once a week for six months during that year. His first suicide attempt came in 1967, and he saw Dr. Wood again that year for approximately six months.

By 1994, Dr. Wood was no longer in practice and had not retained records relating to his observations of Walton. The only contemporaneous written record available from the early sixties is a letter from Dr. Charles C. Schober, whom Walton consulted in 1964 for "emotional problems." Dr. Schober wrote to Walton's draft board on August 14, 1964, in support of an application for a deferment. He there reported that Walton "has periods of apathy and depression coupled with a tendency to rebel seriously which inhibits his performance and productivity." Record 162. In Dr. Schober's opinion, these problems would "hamper his performance in the military service." Id.

B.

At the hearing, the ALJ listened to Walton's account of the progression of his illness and solicited the reaction to that account of Dr. Morris Rubin, a psychologist and vocational expert.1 The ALJ recognized that some mental disorders, including the sort from which Walton suffers, take time to recognize and diagnose. He also noted that, while it seemed clear that Walton suffered from a mental impairment rising to the level of disability at some point in his life, the timing of the disability's onset was uncertain:

_____

1. In his resume, Dr. Rubin describes his current occupation as "Counseling/Consulting–Psychologist." He has earned a B.S. in psychology, an M.S. in Psychology Guidance, and an Ed.D. in Psychology Guidance. He has worked as a certified school psychologist and as a vocational advisor.

4

ALJ: The picture . . . Dr. Rubin, after '71 gets clear, I think.

[Dr. Morris Rubin]: Yes, much clearer.

ALJ: Because there's a hospitalization which is used. All with clear information. And then six hospitalizations follow. And the period befor e that--of course, a lot of this is just a problem of documentation that occurs [due] to passage of time plus as you mentioned to Dr. Rubin, I believe, or Mr . Walton did is that there's a sort of reluctance of diagnoses in this type of thing until after a period of time has passed.

* * *

ALJ: So this is not an unusual pattern we'r e seeing here.

Dr. Rubin: Not an unusual pattern.

ALJ: But it still leaves me with the pr oblem of drawing a line at a particular point. It obviously was not before age 14.

* * *

ALJ: . . . [U]nfortunately, Mr. W alton has had a problem since . . . [a]ge 14, which is very significant and is very clear in the present and we'r e right at that point in time where I have to make a decision as to where to draw the line. Age--it's somewher e between 14 and 23, I would think, or 24, or 25, or [in 1971]. And it's an unusual case in that the line seems to hover very close around that point in time. . .. It's a difficult--I think this is a difficult line for me to draw.

Record 80-83 (emphasis added).

The ALJ personally elicited Dr. Rubin's opinion on the onset issue. Dr. Rubin opined that Walton's 1967 suicide attempt was an expression of the severity of W alton's impairment at that time. Dr. Rubin further regarded it as likely that Walton was unable to work on a continuing basis after the age of fourteen:

ALJ: . . . Dr. Rubin, want [sic] to volunteer anything here? I think it's a fuzzy, fuzzy period that year or two in there.

5

Dr. Rubin: It's hard to explain, Y our Honor. But if we liken it, if I may say, expressed in feeling, if I can liken his educational experiences from 14 years of age up, certainly if we turn it into some sort of employment, he wouldn't be able to hold positions for any length of time, but we'd have the mood swings. He would run into difficulty. But it's difficult to say whether he would be an employable constantly.

* * *

 . . . [A]s it's shown here, in my opinion, he would have a lot of difficulty holdings [sic] jobs for long periods of time or reasonable periods of time for the satisfaction of an employer. Probably get fired a lot of times or even quit. Got in a mood, he would quit.

Record 84-85.

In addition to contemporaneous medical recor ds, Walton tendered letters authored in the early nineties by doctors who had treated him at various times in the past: Dr. Howard Wood; Dr. Henry D. Cornman, III;2 Dr. JohnW. Goppelt; and Dr. Robert Gibbon. Dr. W ood reported that he treated Walton when he dropped out of college but did not remember his diagnosis: "I don't remember exactly what my diagnosis was, but I don't believe I recognized him as manic-depressive. He seemed to be a disturbed adolescent. I have had several patients whose bipolar pictur e only became evident after a period of years." Recor d 255. Dr. Cornman reported that during high school Walton "became withdrawn, isolated and lost interest in everything." Record 254. He also reported that Walton's par ents had provided his support all of his life and that he, Dr. Cornman, could "confirm that . . . Walton was disabled before his 22nd birthday." Id. Dr. Goppelt opined:

_____

2. The ALJ describes Dr. Cornman"as a neighbor, . . . not a professional treating source." Record 30. Dr. Cornman reported in 1992, however, that he had treated Walton for "the past ten years." Record 254. He simply supplements his ten years of clinical familiarity with Walton's condition by noting that he had been friendly with W alton and his family since the 1940s.

6

In my opinion the psychiatric diagnosis in Geof frey's case is incomplete unless it includes personality disorders, which Geoffrey never mentions. He shows elements of the histrionic disorder and the anti-social disorder, along with a bipolar disor der which has responded poorly to treatment, in part because Geoffrey has often not cooperated with his treatment.

Record 257.

In his report, Dr. Gibbon states that"by virtue of his mental condition, [Walton] has not been sustainably employable in the open job market" and that "[i]n the first fifteen years out of high school, he held about half a dozen jobs, typically for three months." Recor d 271.

C.

In his decision, the ALJ found Dr. Wood's letter significant only because it reflected, in the ALJ's view, that Walton had been seen "not for manic depr ession but for adolescent disturbance." Record 30. The ALJ dismissed Dr. Cornman as "not a professional tr eating source" and Dr. Gibbon's report as "clearly based upon infor mation provided by [Walton] and not upon Dr. Gibbon's own observation of [Walton] prior to his 22nd birthday." Id. The ALJ's evaluation of Dr. Goppelt's report was as follows:

> Dr. Goppelt, in his treatment of the claimant, actually was apparently convinced that Mr. W alton could more readily be defined as subject more to personality and anti-social disorder than bipolar disor der. Further, he believed that the claimant's emotional condition was currently poorly controlled basically because of the claimant's own irresponsibility and lack of cooperation.

Record 31. The ALJ's decision makes no r eference to Dr. Rubin's views on the onset issue.

The ALJ concluded as follows:

> In consideration of the medical documentation as well as reports of the claimant's educational achievement prior to his 22nd birthday and notwithstanding the claimant's allegations or those of his neighbor Dr .

7

Cornman, or Dr. Gibbon, the Administrative Law Judge finds that Mr. Walton may have been treated for some adolescent disturbance in 1964 or 1965. He was able to acquire a draft deferment when he left school. The method by which this result was achieved is certainly not indicative of either ongoing mental or emotional disorganization. There is no contemporaneous further record of his receiving treatment for severe emotional or mental impairment through June 14, 1966. It is the opinion of this administrative law judge that the fact that the claimant was not in school at the time he achieved his 22nd birthday is not dispositive of any ongoing emotional impairment. Noteworthy is the fact that student unrest in many forms was pr evalent in colleges throughout the nation at that time.

* * *

FINDINGS

* * *

5. Prior to attaining age 22, the claimant had the following medically determinable impair ments: adolescent disturbance, which was not severe in nature.

6. The claimant is not under a "disability" as defined in the Social Security Act, which began before he attained age 22.

App. at 32-33.

IV.

A.

Social Security Rulings "are binding on all components of the Social Security Administration." 20 C.F .R. S 402.35(b)(1). Social Security Ruling 83-20 ("SSR 83-20) is of particular pertinence here:

 With slowly progressive impair ments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.

8

Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

* * *

In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However , the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

* * *

In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination. . . . How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

* * *

If reasonable inferences about the pr ogression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to fur nish additional evidence regarding the course of the individual's condition.

> * * *

> The available medical evidence should be considered
> in view of the nature of the impairment (i.e., what
> medical presumptions can reasonably be made about
> the course of the condition).

SSR 83-20.

This is a case involving a previously hospitalized claimant alleging disability on the basis of a psychiatric impairment. That impairment was a slowly progr essive one and the alleged onset date was far in the past. Adequate medical records for the most relevant period were not available. This meant that it was "necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." An "informed judgment" was required, a judgment with a "legitimate medical basis."

B.

Here, with the arguable exception of Dr . Wood's having no affirmative recollection of having r ecognized Walton as a manic depressive prior to his twenty-second birthday, all of the medical evidence suggested an onset prior to that birthday.[3] To be sur e, that evidence was not based upon personal observation of Walton prior to age twenty-two. Nevertheless, the ALJ could not, consistent with SSR 83-20 and the necessity of establishing an onset date based on substantial evidence, simply ignore that evidence and draw an inference from the record evidence having no substantial medical support. Because there is no legitimate medical

_____

3. We find no support for the ALJ's interpretation of Dr. Goppelt's letter.
Dr. Goppelt did not opine that W alton was more accurately diagnosed as having a "personality and anti-social disorder than [a] bipolar disorder." Record 31. His opinion was that Walton suffered from both bipolar-manic depression and a personality and antisocial disorder. Similarly, Dr. Goppelt's letter did not attribute W alton's condition to "irresponsibility." He did report that Walton's condition has "responded poorly to treatment, in part because [he] has often not cooperated with his treatment." Record 257. Dr. Goppelt explained, however, that Walton's poor cooperation is the result, not the cause, of his illness. Id.

10

basis for the conclusion of the ALJ on the onset issue, we will reverse the judgment of the District Court and remand with instructions to return this matter to the Commission for further proceedings.

Given the record evidence concerning the period of time frequently necessary to diagnose a bipolar disorder like Walton's, we conclude that Dr. W ood's letter concerning his failure to diagnose Walton as a manic depressive prior to age twenty-two would not alone provide a basis for a post-twenty-one onset date even if Dr. Wood had a clearer recollection about Walton's case.

Moreover, SSR 83-20 and the substantial evidence rule dictate, we conclude, that an ALJ in a situation of this kind must call upon the services of a medical advisor rather than rely on his own lay analysis of the evidence. Our conclusion on this issue is consistent with those r eached by our sister courts of appeals in similar situations. See Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997) "[i]f the medical evidence is ambiguous and a retroactive inference is necessary, SSR 83-20 requir es the ALJ to call upon the services of a medical advisor to insur e that the determination of onset is based upon a `legitimate medical basis' "); Bailey v. Chater, 68 F .3d 75, 79 (4th Cir. 1995) (mandating enlistment of a medical expert when onset is ambiguous despite SSR 83-20's apparently per missive language); Spellman v. Shalala, 1 F.3d 357, 362 (1993) ("We therefore hold that in cases involving slowly progressive impairments, when the medical evidence r egarding the onset date of a disability is ambiguous and the Secr etary must infer the onset date, SSR 83-20 requir es that that inference be based on an informed judgment. The Secretary cannot make such an inference without the assistance of a medical advisor."); DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 r equires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination."); Blankenship v. Bowen, 874 F.2d 1116, 1122-24 (6th Cir . 1989); Lichter v. Bowen, 814 F.2d 430, 434-436 (7th Cir . 1987).

11

Ironically, the ALJ in this case appear ed to recognize his need for expert help and noted during the hearing that he "might possibly feel the need to secure a[`medical expert'] subsequently." Record 42. Perhaps because of this concern, the ALJ treated Dr. Rubin at the hearing as both a medical advisor and a vocational expert. When deciding the case, however, he chose to ignore Dr. Rubin's views without comment. Having secured the professional opinion of a licensed psychologist, we conclude the ALJ was not entitled to disregard it without articulated r eason. As we have explained on numerous occasions, we are unable to conduct our substantial evidence review if the ALJ fails to identify the evidence he or she rejects and the reason for its rejection. See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112,119–20 (3d Cir. 2000); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 433 (3d. Cir. 1999); Barren Creek Coal Co. v. Witmer, 111 F .3d 352, 356 (3d Cir. 1997); Cotter v. Harris, 642 F.2d 700, 705 (3d. Cir. 1981).

Finally, we conclude that the ALJ, even if he had had the assistance of a medical advisor, could not have rejected the opinion of Dr. Gibbon, a treating physician, solely on the basis that his opinion was based on information supplied by Walton and not on personal observation of Walton during the relevant period. As SSR 83–20 clearly reflects, a conclusion regarding onset in a situation of this kind can, and frequently must, be based on information gathered after the fact from the claimant and, indeed, from other lay people like family and neighbors. The basis for a medical opinion is, of course, an indispensable element of a reasoned evaluation of it, and there ar e, of course, situations in which an opinion based on personal observation may be favored over one based on information supplied by the claimant. But this is a situation in which an opinion based on personal, contemporaneous observation was not available. In such a situation, SSR 83–20 calls for an ALJ to have the benefit of expert medical advice based on the best available data without r egard to its source.

12

V.

We will reverse the judgment of the District Court and remand with instructions to return this matter to the agency for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit