

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-6-2003

# Beasich v. Comm Social Security

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-3627

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

## Recommended Citation

"Beasich v. Comm Social Security" (2003). *2003 Decisions.* Paper 476.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/476

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3627

JOSEPH BEASICH,

<u>Appellant</u>

v.

COMMISSIONER OF SOCIAL SECURITY

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 00-cv-01557)
District Judge: Honorable Dennis M. Cavanaugh

Argued April 8, 2003

BEFORE: ALITO, FUENTES, and GREENBERG, <u>Circuit</u> <u>Judges</u>

(Filed: June 6, 2003)

Thomas H. Klein (argued)
Smith & Klein
100 Broad Street
Eatontown, NJ 07724

<u>Attorneys</u> <u>for</u> <u>Appellant</u>

Christopher J. Christie
United States Attorney
Peter G. O'Malley
Assistant United States Attorney

Office of United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102

Barbara L. Spivak
Chief Counsel - Region II
Susan C. Branagan (argued)
Assistant Regional Counsel
Office of the General Counsel
Social Security Administration
26 Federal Plaza
New York, NY 10278

Attorneys for Appellee

---

OPINION OF THE COURT

---

GREENBERG, Circuit Judge.

This matter comes on before this court on appeal from an order entered July 30, 2002, affirming a final decision of the Commissioner of Social Security denying appellant Joseph Beasich's request for benefits as a disabled adult child under Title II of the Social Security Act. The district court had jurisdiction pursuant to 42 U.S.C. § 405(g) and we have jurisdiction over Beasich's appeal pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we will reverse the district court's order affirming the Commissioner's decision and remand the case with instructions in turn to remand it to the Commissioner for further proceedings consistent with this opinion.

2

## I.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A.  Procedural History

On October 8, 1996, Beasich, who was 30 years old, applied for disabled adult child's benefits on the account of his deceased father, John Beasich, alleging that he had been disabled since July 1, 1981.  To receive child's benefits based on his deceased father's earnings record, Beasich needed to demonstrate, inter alia, that he had a disability before attaining age 22 and that this disability continued without interruption through the date of his application.  See 42 U.S.C. § 402(d); 20 C.F.R. § 404.350; Smolen v. Chater, 80 F.3d 1273, 1280 (9th Cir. 1996) (collecting cases).  Beasich also filed an application for Supplemental Security Income ("SSI") benefits.  The Social Security Administration ("SSA") originally denied both applications on January 24, 1997.  On reconsideration, however, the SSA found that Beasich had a psychiatric and neurological condition as a result of a head injury at age 14 and that his current psychiatric condition impacted on his ability to maintain concentration and had prevented him from engaging in work activity from August 1, 1996.  Therefore, the SSA found Beasich to be presently disabled and that the disability dated back to August 1, 1996.  Thus, it granted SSI benefits.  Nevertheless, inasmuch as there was insufficient information in the record to determine his condition between the ages of 18 to 22 years, the SSA denied his claim for disabled adult child's benefits.  Beasich appealed and a hearing was held on April 20, 1998, before Administrative Law Judge ("ALJ") Michael H. Noorigian.  On August 26, 1998, the ALJ

3

issued a decision denying an earlier disability onset date for benefits, thus rejecting the disabled adult child's benefits application. After the Appeals Council denied a request for administrative review on February 23, 2000, ALJ Noorigian's decision became the final administrative decision.

On April 3, 2000, Beasich filed a complaint in the district court requesting a remand of this matter for a new hearing pursuant to sentence four of 42 U.S.C. § 405(g). The case was submitted to the district court on the record and briefs without oral argument and the district court affirmed the final decision of the Commissioner on July 30, 2002. Beasich thereafter filed this appeal.

B. Factual Background

Beasich was born on August 31, 1966, in Union Beach, New Jersey. He has lived with his mother since birth; his father committed suicide when Beasich was nine years old. Beasich is currently 36 years old. In 1981, when Beasich was 14 years old, he sustained a severe head injury when a fishing gaffe struck him in the head. The injury caused multiple impairments, including seizures. Beasich experienced his first grand mal seizure several hours after the head injury.

Reports from Beasich's school in 1982 and 1983 indicate that he had emotional, behavioral and attendance-related problems. He had damaged self-esteem and low self-confidence. He was classified as "emotionally disturbed" and eligible for special education services. Prior to his head injury he had been identified as having a learning

disability and had failed eighth grade. At age 15, his IQ tests showed he had borderline intellectual functioning. Beasich dropped out of high school at age 16, roughly at the same time that he began re-experiencing the seizures he had suffered immediately after his head injury, and did not complete his education. Beasich and his mother testified that after he dropped out of school he continued to suffer from grand mal and petit mal seizures, rarely left his home, and suffered from symptoms of depression.

(a) Medical Records Before ALJ Noorigian

The record before ALJ Noorigian included numerous reports from physicians, psychiatrists, psychologists, and other professionals who either treated or examined Beasich. Beasich turned 22 years old in 1988, and the period from 1984 to 1988 was of particular concern in determining the disability onset date. The evaluations related to this period consisted of the "Pertchik Reports" by Dr. Alan Pertchik, "Educational Evaluations," "Psychological Evaluations" by Dr. Elizabeth Degnan, and an "Emotionally Disturbed Classification" by a Middletown Child Study Team. In addition, evaluations were submitted after 1988 by: Dr. Pertchik; Dr. A. John Haddad (the "Haddad Report"); Dr. Robert B. Sica (the "Sica Report"); Dr. S.C. Fan (the "Fan Report"); Dr. Alan A. Cavaiola (the "Cavaiola Report"); Dr. David A. Reskof (the "Reskof Report"); Dr. V.N. Makhija (the "Makhija Report); Dr. Michael D'Adamo (the "D'Adamo Report"); Dr. Cavaiola (the Cavaiola Report #2); Dr. D. Fugati (the "Fugati Report"); and Residual Physical Functional Capacity Assessment.

5

1. The Pertchik Reports

Dr. Alan Pertchik is a neurologist who prepared numerous reports regarding Beasich between January 31, 1984, and July 10, 1989. Pertchik prepared his January 31, 1984 Report when Beasich was 17 years old. Beasich was referred to Dr. Pertchik because of two seizures he suffered in 1981 and 1983. Dr. Pertchik initially diagnosed Beasich with probable post traumatic seizure disorder and probable post traumatic behavioral changes. Pertchik prescribed Tegretol for the seizure condition and warned Beasich of possible side effects.

On May 4, 1984, Dr. Pertchik reported that Beasich had had no further spells but was somewhat irritable, slightly fatigued and "moody," but cooperative. Beasich had been seizure free for six months and the possible post traumatic behavioral changes was reported as possibly stable.

On July 2, 1984, Beasich had been taking only varying amounts of Tegretol and had become irritable and was acting out, whether or not he was on medication. Dr. Pertchik noted possible recurrent spells as acting out episodes and possible "fogged" feeling. Dr. Pertchik reported that Beasich appeared cooperative and understood the pluses and minuses of use of medication. Dr. Pertchik recommended regular use of the Tegretol in smaller does, with the possibility of changing the medication. There had not been any seizures since the last examination, and Dr. Pertchik found that the possible post traumatic behavioral changes were "probably stable," though it was noted a personality

6

disorder may have been present.

On August 24, 1984, Beasich suffered a grand mal seizure, at which time he had been drinking and had discontinued the use of his medication. His tongue was lacerated on the right side from the seizure. Dr. Pertchik prohibited Beasich from driving and urged seizure precautions.

On June 6, 1986, it was reported that Beasich again had experienced a grand mal seizure, as well as one four months prior to that in February. Beasich had discontinued his medication a few weeks prior to the episodes and had been drinking ethanol.

Dr. Pertchik made his last examination on July 10, 1989. Dr. Pertchik reported that Beasich had been experiencing a variable number of seizures and that since 1987 had been off his medication. Dr. Pertchik reported that the seizures were secondary to his intrinsic seizure disorder and compounded by ethanol withdrawal and lack of sleep. Dr. Pertchik recommended the continuation of Tegretol, further seizure precautions, and follow-up medical visits.

2. Educational Evaluations

On January 11, 1982, and February 1, 1982, roughly six and seven months after his head injury and first seizure, Beasich was evaluated at school at the request of his mother because of his poor performance in high school. The evaluation noted that he had had behavior problems in junior high school and had failed eighth grade and in ninth grade had received Ds in all subjects except math which he failed. Several tests were

7

administered including the Peabody Individual Achievement Test and the Woodcock Johnson Psycho Educational Test. The examiner found evidence of perceptual problems, but felt that Beasich's behavior and attendance problems were of primary concern.

3. Psychological Evaluation

Dr. Elizabeth Degnan is a psychologist who evaluated Beasich on behalf of the Office of Pupil Personnel Services of the Middletown Township Board of Education. Dr. Degnan met with Beasich on February 2, 1982. The purpose of the meeting was to determine an appropriate educational program for Beasich because of his academic and behavior problems, which had caused the school administration to put him on home instruction. Dr. Degnan administered several tests, wherein Beasich obtained a full scale IQ of 80 placing him within the borderline range of intellectual functioning. Dr. Degnan found that he came across as an immature, narcissistic, ineffective personality and that he had damaged self-esteem and low self-confidence. Dr. Degnan found that he had low average ability but was not able to utilize his strengths because of his hostile, negative, and anti-social approach. She recommended additional therapy and that he attend a structured, vocationally-oriented school.

4. Emotionally Disturbed Classification

On March 17, 1983, a child study team (composed of a psychologist and social workers) of the Middletown Township Schools met jointly and determined that Beasich was eligible for special educational services. He was classified as emotionally disturbed

and a special education plan was suggested to meet his needs.

5.  The Haddad Report

Beasich was referred to Dr. A. John Haddad through the New Jersey Division of Vocational Rehabilitation to assess the severity of his condition.  Dr. Haddad first examined Beasich on April 13, 1989, and examined him again on March 27, 1993, December 24, 1994, and August 30, 1996.  Dr. Haddad diagnosed Beasich as having grand mal seizures and needing treatment by a neurologist.

6.  The Sica Report

In 1994, Beasich contacted the  Division of Vocational Rehabilitation for help and they sent him to Dr. Robert Sica for neuropsychological testing.  Dr. Sica, a psychologist, found that Beasich's test scores indicated significant deficits in attention/concentration, but that his other mental functions were largely within normal limits.  A long history of learning disability was noted.  Dr. Sica noted that in addition to Beasich's cognitive problems, as a result of the head trauma Beasich also suffered total hair loss at the age of 16.  Dr. Sica noted that Beasich's information processing was slowed because of the Tegretol and that the medication also undermined his recall and had sedative effects.  As a consequence of his slowed rate of information processing, Dr. Sica found that Beasich was "plagued with serious difficulty with his ability to attend, concentrate, consolidate information, and general efficiency in the way he goes about doing tasks."  Tr. at 177.  Dr. Sica concluded that Beasich's experiences negatively

9

affected his personality development considering the young age at which these events took place. Dr. Sica diagnosed Beasich as having a learning disability and post concussion syndrome.

7. The Fan Report

On December 13, 1996, Beasich was referred to Dr. S.C. Fan, a neurologist, by the Division of Vocational Rehabilitation. Beasich indicated that he had several seizures in the preceding months, that he had been taking Tegretol on a regular basis, but had not had blood tests conducted in three years. Dr. Fan believed that Beasich's seizures could be controlled to a minimal frequency if he complied with the schedule for his medication and that psychotherapy was required to manage his anxiety and depression.

8. The Cavaiola Report

On November 6, 1996, Dr. Alan Cavaiola, a psychologist, performed a psychodiagnositic evaluation on Beasich. Dr. Cavaiola observed that Beasich presented a multitude of psychological distress symptoms which included anxiety, depression, hostility, social and interpersonal sensitivity and obsessive compulsive worries. His diagnostic impression was: (a) mood disorder due to head trauma (predominant mood: depressive and anxious); (b) personality change due to head trauma; (c) avoidant personality disorder with paranoid personality traits; (d) head trauma sequella, e.g., seizures; (e) severe stressors (inability to obtain job and financial and family stress); and

10

(f) current GAF.[1]  Dr. Cavaiola noted that since the head injury Beasich had been unable either to find or maintain a regular job and continuously had been isolated socially.  Dr. Cavaiola recommended that Beasich be referred for a psychiatric evaluation to rule out suicidal potentiality and to assess which medications could alleviate his anger and depressive symptoms.  Id.

9.  The Reskof Report

Dr. David A. Reskof did a psychiatric evaluation on December 17, 1996. Beasich had gone to the Division of Vocational Rehabilitation for a job program, but reported that he could not obtain a decent job due to his recurrent seizures.  Dr. Reskof determined that Beasich's sexual drive had been reduced and that he had not had intimate interactions with women since he had been involved in an episode of sexual intercourse when he was a teenager and had a seizure during the experience.  Beasich reported that he had difficulty sleeping and concentrating and had constant thoughts of suicide.  Dr. Reskof found that Beasich had occasional episodes of flight of ideas and insomnia, and that he was angry, irritable and his judgment was impaired.  Dr. Reskof's diagnosis was that Beasich suffered from post traumatic stress disorder with features of anxiety and depression.  Dr. Reskof placed Beasich on Prozac.

10.  The Makhija Report

---

[1]Dr. Cavaiola specified Beasich's "Current GAF" without giving a numerical valuation.  Tr. at 196.

On January 11, 1997, the SSA had Beasich examined by Dr. V.N. Makhija, a psychologist. Beasich reported that he felt paralyzed with stress and depression and indicated that he had felt depressed for many years. Dr. Makhija found that Beasich was inactive, worried excessively, and uncomfortable around people. Dr. Makhija also concluded that Beasich was withdrawn, anxious, depressed and suicidal. Beasich was diagnosed with dysthymic disorder, social phobia, borderline personality disorder, and post traumatic seizure disorder.

11. The D'Adamo Report

On January 17, 1997, Dr. Michael D'Adamo, a medical expert for the Commissioner at the Disability Determination Service, performed a mental residual functional capacity assessment. It was determined that Beasich was able to understand, retain and execute simple directions. However, due to his social anxieties, he was equipped to do only "low contact work." Tr. at 212.

12. The Cavaiola Report #2

On February 25, 1997, Dr. Cavaiola provided a supplemental report noting that Beasich had been approved by the Division of Vocational Rehabilitation for rehabilitation services. The Division of Vocational Rehabilitation had referred Beasich to a job placement service, where he was given a job for 12 hours per week. Despite the effort, Beasich was limited in his ability to do work. The report noted that Beasich was taking Tegretol, Prozac, and a sleep medication on a regular basis. The final prognosis by

12

Dr. Cavaiola was that Beasich probably would not be able to work enough hours to be self-sufficient or self-supporting.

13.  The Fugati Report

On March 7, 1997, Dr. Douglas Fugati, a state agency psychologist, performed a psychiatric review technique and a mental residual functional capacity assessment.  After considering all the medical evidence, it was determined through the psychiatric review technique that Beasich was disabled.  The disability was established under listing 12.04 (affective disorders).  The mental residual functional capacity assessment found marked limitations in his ability to understand detailed instructions, concentrate, complete a normal workday, get along with co-workers, respond to supervisor instructions, and respond appropriately to changes in the work setting.  In addition, moderate limitations in numerous other mental capacity work requirements were found to exist.

14.  Residual Physical Functional Capacity Assessment

On March 10, 1997, a state agency physician performed a residual physical functional capacity assessment.  It was determined that Beasich never should take part in work involving  scaffolds, ladders or machinery.

(b) Testimony Before ALJ Noorigian

1.  Joseph Beasich

Beasich testified before the ALJ on April 20, 1998.  He testified that he had lived with his mother all his life, quit high school after tenth grade, while in school had been in

13

remedial classes, never had balanced a check book, and never had been able to get a driver's license. He testified that after he quit high school he stayed home and "just lost it." Tr. at 250. When asked specifically about the time period from when he quit high school up to 1988 Beasich stated that "it was a bad time" and that "[I] [j]ust started having seizures [and] lost all my friends." Tr. at 257. He testified that from 1986 to 1988 "I was a wreck . . . back then I was a mess . . . . Mentally, physically, emotionally, my whole life was upside down. I went from being a popular, outgoing, athletic person to being a shut-in with no life whatsoever." Tr. at 263-64. He testified that during the period from 1986 to 1988 he had trouble sleeping, his energy level was "lousy," he "was depressed" and "didn't want to do anything," and he had temper problems. Tr. at 267, 16. When asked why he had not been treated for depression during that period Beasich explained that he did not think his mother could afford it and that he did not understand then what was happening to him.

Beasich testified that when his seizures resumed, when he was approximately 16 years old, he would have one every two months, or one a month, but sometimes he would have two in a week. He described these as grand mal seizures with loss of consciousness, incontinence, injury to tongue and a recovery period of three to four days. He also testified that he had petit mal seizures with temporary loss of conscious perception, occurring one to three times a week. He explained that for several years he took his medication "on and off" because of the side effects of the medication. Tr. at 260-61. He

14

testified that he has had only a few jobs of short duration since his 1981 head injury. He obtained those jobs through special state placement programs or he did odd short stint jobs for friends.

2. Kathleen Mulligan

Kathleen Mulligan, Beasich's mother, also testified before the ALJ on April 20, 1998. She testified that Beasich has resided with her since birth, and that he had learning problems since the first or second grade. She testified that after the 1981 accident and the initial seizure Beasich's behavior worsened substantially and that since the accident he had had a bad temper. She testified that when his seizures resumed, at approximately age 16, he would have a grand mal seizure approximately once a month. She testified that Beasich's seizures were quite severe, at times rendering him helpless from fatigue for three to four days. Mulligan also gave a detailed account of the emotional and behavioral changes in her son resulting from his head injury in 1981. She testified that he transformed from a social and active teenager to an introvert who lost all of his hair and was afraid to leave his home or see other people and who had no control of his emotions. She explained that there was a period during which he took his medicine off and on because he thought "the medication was causing the problem when actually it was the seizure disorder itself and his emotional state that was causing the problems." Tr. at 281. Mulligan also stated that she attempted to get help for her son prior to 1996 when Beasich began to receive extensive mental health treatment, but that he often refused to attend the

15

sessions.

## II.  DISCUSSION

### A.  Standard of Review

We exercise plenary review over the order of the district court, see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000), but review the decision of the Commissioner to determine whether it is supported by substantial evidence.  See Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 1422 (1971).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 401, 91 S.Ct. at 1427 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)).  It is more than a mere scintilla of evidence but may be less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Of course, we exercise plenary review over questions of law.  See Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).

### B.  Statutory and Regulatory Framework

In order to establish a disability under the Social Security Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  Stunkard v. Secretary of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988) (quoting  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987)); 42 U.S.C. §

16

423(d)(1)(A).  A claimant is considered unable to engage in any substantial gainful

activity "only if his physical or mental impairment or impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The SSA has promulgated regulations incorporating a five-step sequential

evaluation process for determining whether a claimant is under a disability.  See 20

C.F.R. § 404.1520; Williams v. Sullivan, 970 F.2d 1178, 1180 (3d Cir. 1992).  The first

two steps involve threshold determinations.  In step one, the Commissioner must

determine whether the claimant currently is engaging in substantial gainful activity.

Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000).  If a claimant

is found to be engaged in substantial gainful activity, the disability claim will be denied.

Id.  In step two, the Commissioner must determine whether the claimant has a medically

severe impairment or combination of impairments.  See id.  If the claimant does not have

a severe impairment or combination of impairments, the disability claim is denied.  See

id.  In step three, the Commissioner compares the medical evidence of the claimant's

impairment to a list of impairments presumed severe enough to preclude any gainful

work.  Id.  If the impairment is equivalent to a listed impairment the disability claim is

granted without further analysis.  If a claimant does not suffer from a listed impairment or

its equivalent, the analysis proceeds to steps four and five.  Id.  Step four requires the ALJ

17

to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  Id.  The claimant bears the burden of demonstrating an inability to return to his past relevant work.  Id.  If the claimant does not meet the burden the claim is denied.

If the claimant is unable to resume his former occupation, the evaluation moves to the final step.  Id.  At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  Id.  The Commissioner must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  Id.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he is capable of performing work and is not disabled.  Id. at 118-19.

In this case, the ALJ addressed the first two steps and found: (1) Beasich did not engage in substantial gainful activity before August 31, 1988, and (2) before August 31, 1988, when he attained 22 years of age, Beasich did not have any medically determinable impairment which significantly limited his ability to perform basic work-related functions; therefore, Beasich did not have a severe impairment.  Accordingly, the ALJ concluded that Beasich was not disabled at any time before August 31, 1988.  The ALJ did not reach steps three through five of the five-step sequential analysis.

18

C. The Step-Two Determination

As mentioned above, at step two of the five-step sequential inquiry the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. See Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 2291 (1987); Social Security Ruling ("SSR") 86-8; SSR 85-28. The Social Security Regulations and Rulings,[2] as well as case law applying them, discuss the step-two severity determination in terms of what is "not severe." Smolen v. Chater, 80 F.3d at 1290. According to the Commissioner's regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." Id. (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(a)(1991)). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id. (quoting 20 C.F.R. § 140.1521(b)).

The step-two inquiry is a de minimis screening device to dispose of groundless claims. See Smolen v. Chater, 80 F.3d at 1290; McDonald v. Secretary of Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986). An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have "no more than a minimal

_____

[2]Social Security Rulings constitute the SSA's interpretations of the statute it administers and of its own regulations. Chavez v. Dep't of Health & Human Servs., 103 F.3d 849, 851 (9th Cir. 1996). Social Security Rulings do not have the force of law, id.; nevertheless, once published, they are binding on all components of the SSA. Walton v. Halter, 243 F.3d 703, 708 (3d Cir. 2001).

19

effect on an individual's ability to work." SSR 85-28. Only those claimants with slight

abnormalities that do not significantly limit any "basic work activity" can be denied

benefits at step two. See Bowen v. Yuckert, 482 U.S. at 158, 107 S.Ct. at 2300

(O'Connor, J., concurring). If the evidence presented by the claimant presents more than

a "slight abnormality," the step-two requirement of "severe" is met, and the sequential

evaluation process should continue. See Smolen v. Chater, 80 F.3d at 1290. Reasonable

doubts on severity are to be resolved in favor of the claimant.[3]

In this case, the ALJ found "that claimant's infrequent medical visits and the lack

of medical evidence suggests that at the time period relevant to this decision, the claimant

had no impairment or significant limitations flowing from his seizure disorder." Tr. at 18.

With respect to Beasich's "mental status," although the ALJ noted Mulligan's testimony,

he concluded that "medically, there is again a lack of evidence to establish mental illness

with vocationally significant limitations." Id. The ALJ found that Beasich's school

records "do not establish a medical impediment" and "even though there was an

indication of a 'learning disorder,' he attended regular school classes although with an

individual educational plan to assist him." Id. The ALJ concluded stating:

In sum, this record does not establish medically determined

---

[3]SSR 85-28 states that "[g]reat care should be exercised in applying the not severe
impairment concept. If an adjudicator is unable to determine clearly the effect of an
impairment or combination of impairments on the individual's ability to do basic work
activities, the sequential evaluation process should not end with the not severe evaluation
step. Rather, it should be continued."

impairment(s) for the period at issue that could reasonably be expected to produce the symptoms alleged. Even if such an impairment(s) were established, the absence of treatment, the absence of any medical basis for saying that claimant was unable to seek treatment due to his illness, the effectiveness of his seizure medication (when taken, with no physical describing adverse side effects) and his enrollment in regular high school classes, would all lead to the conclusion that the complaints could not be accepted as credible.

Tr. at 22.

(a) The ALJ Denied Beasich's Claim At Step Two On Erroneous Bases

The first reason given by the ALJ for finding that Beasich did not have any impairment which significantly limited his ability to perform basic work-related functions was his "infrequent medical visits and the lack of medical evidence." Tr. at 18. However, the record clearly shows that a neurologist, Dr. Pertchik, treated Beasich for his seizure disorder during this period. In addition to diagnosing Beasich with post traumatic seizure disorder, Dr. Pertchik diagnosed him with probable post traumatic behavioral changes, and noted that a personality disorder might be present. At his mother's request, Beasich was also subject to educational and psychological evaluations through his school.

It is true that there was a lack of medical treatment for mental impairment during this period. However, several courts have questioned the relevance of infrequent medical visits in determining when or whether a claimant is disabled.[4] The fact that a "claimant may be one of the millions of people who did not seek treatment for a mental disorder

_____

[4]Unquestionably Beasich currently suffers from a mental impairment.

21

until late in the day" is not a substantial basis to reject that an impairment existed. <u>Van Nguyen v. Chater</u>, 100 F.3d 1462, 1465 (9th Cir. 1996). As the Court of Appeals for the Sixth Circuit has noted in finding invalid an ALJ's reasons for rejecting claimant's assertions about his depression, "[a]ppellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." <u>Blankenship v. Bowen</u>, 874 F.2d 1116, 1124 (6th Cir. 1989).[5]

Retrospective diagnosis of a mental impairments like depression and post traumatic stress disorder, even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to the claimed period of disability, can support a finding of past impairment. <u>See</u> <u>Loza v. Apfel</u>, 219 F.3d 378, 396 (5th Cir. 2000); <u>Likes v. Callahan</u>, 112 F.3d 189, 191 (5th Cir. 1997). While no doctor was asked for a retrospective diagnosis here, there is evidence in Beasich's more recent medical records indicating that Beasich's impairments are longstanding. These non-contemporaneous medical records are relevant to the determination of whether onset

---

[5]In addition, SSR 96-7p states that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Beasich explained his lack of medical treatment for depression in this period, indicating that he really did not understand what was happening to him and did not think his mother could afford treatment for him. The ALJ did not address Beasich's explanation in his decision.

22

occurred on the date alleged by Beasich.  See Ivy v. Sullivan, 898 F.2d 1045, 1049 (5th Cir. 1990).

The ALJ also used the lack of medical treatment for mental impairment during the period between 1984 and 1988 as a reason for not crediting Beasich's and Mulligan's testimony.  However, lay evidence does not have to be corroborated by contemporaneous medical evidence to be credible.  See Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984) (lay evidence must be considered even if uncorroborated by medical evidence). Lay testimony as to mental functioning cannot be deemed non-credible simply because contemporaneous medical corroboration is lacking.  See Godbey v. Apfel, 238 F.3d 803, 810 (7th Cir. 2000) ("With respect to lay opinions about the existence of depression, this court held in Wilder v. Apfel, 153 F.3d 799, 802 (7th Cir. 1998), that 'what is required is contemporaneous corroboration of the mental illness . . . not necessarily contemporaneous medical corroboration.'").

Beasich is correct that the ALJ did not give proper reasons for questioning his credibility and his mother's testimony.  See Sousa v. Callahan, 143 F.3d 1240, 1244 (9th Cir. 1998) (the Appeals Council cited the length of time between the actual events and the testimony and the lack of corroborating objective evidence as reasons for rejecting the lay testimony. The court found that "[t]hese justifications for the rejection of the lay testimony are not sufficient.").  SSR 83-20 recognizes that sometimes "reasonable inferences about the progression of the impairment cannot be made on the basis of the

23

evidence in file and additional relevant medical evidence is not available" and states that in such cases "it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition." SSR 96-7p provides that an "individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." In this case both Beasich and Mulligan testified that after his seizures resumed, when Beasich was approximately 16 years old, he suffered from symptoms of depression and ceased virtually all productive activity. The ALJ should not have rejected their testimony solely because it was not corroborated by contemporaneous medical evidence.[6]

Whether or not Beasich suffered from a mental impairment in the 1984-88 period that in itself was sufficiently severe for purposes of step two, Beasich correctly argues

---

[6]The ALJ also cited as a reason for not finding that Beasich's complaints could be accepted as credible the fact that Beasich was "enrolled in regular high school classes." Tr. at 22. However, with respect to his high school enrollment, the record makes clear that while Beasich was not in special education, he was at the margins of educational functioning: he failed eighth grade; in ninth grade he received Ds in all subjects except math, which he failed; in tenth grade he was placed in home instruction because of behavioral problems; and he dropped out of high school at the beginning of eleventh grade, at approximately the same time that he began having seizures again.

24

that he "had multiple impairments which if necessary had to be considered in combination with non severe impairments and symptoms to determine severity." Reply br. of appellant at 4. The record indicates that prior to August 31, 1988, Beasich had the following impairments: a learning disability,[7] borderline intellectual functioning,[8] a head injury that resulted in a seizure disorder[9] and which required that he take medication

---

[7]The ALJ seems to have acknowledged that Beasich had a learning disability ("there was an indication of a 'learning disorder.'" Tr. at 18).

[8]The record indicates that on February 4, 1982, when Beasich was 15 years old, Dr. Elizabeth Degnan evaluated him. Dr. Degnan administered several tests, wherein Beasich obtained a full scale IQ of 80, placing him with in the borderline range of intellectual functioning. Borderline intellectual functioning that is supported by the record can be a severe impairment. See Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).

[9]The Pertchik reports document Beasich's medical treatment for his seizure disorder during the period between 1984 and 1989.

which may have negatively impacted his cognitive ability,[10] perceptual,[11] behavioral[12] and

emotional[13] problems, and symptoms of depression.[14]  As mentioned above, at step two

_____

[10]Beasich was first treated with the medication Dilantin.  Dr. Pertchik reported that this medication "caused him to be confused with auditory hallucinations and head pain on exertion" and even when the dosage was reduced he was irritable so the treatment was discontinued.  Tr. at 170.  Dr. Pertchik then prescribed Tegretol.  Dr. Pertchik advised Beasich that the medication would have potential adverse effects.  Dr. Sica noted in 1994 that Beasich's information processing was slowed because of Tegretol and that the medication also has adverse effects on his recall and sedative effects that limit his ability to respond to tasks that require a pressured and timely element.  In 1997 Dr. Fugati, a state agency psychologist, noted that some of Beasich's "sluggishness and lethargy may be due to Tegretol."  Tr. at 216.

[11]When he was 15 years old his educational evaluation indicated that there was evidence of perceptual problems.  When he was 16 years old he was evaluated by a team which included a psychologist and it was noted that Beasich "has a history of perceptual impairment."  Tr. at 144.

[12]Dr. Degnan psychologically evaluated Beasich when he was 15 years old because he "was in trouble academically and behaviorally" and her report noted that he had "behavior problems in the past."  Tr. at 149.  In her findings Dr. Degnan noted that his practical judgment score was low on the Wechsler Intelligence Scale for Children because his responses "reflected aggressive or anti-social ways of handling situations."  Id.  Dr. Degnan found that he was not able to utilize his strengths because of "his hostile, negative, and anti-social approach."  Tr. at 150.  In his educational evaluation that same year it was noted that Beasich "was a behavior problem in Junior High" and that in "High School, Joe's poor behavior resulted in discipline notices."  Tr. at 152.  In 1984 Dr. Pertchik noted that Beasich was irritable and was acting out, whether or not he was on medication.

[13]In 1982, when Beasich was 15 years old, a team that included a psychologist classified him as "emotionally disturbed."  Tr. at 143.  The team concluded that "Joseph is presently functioning in the emotionally disturbed range in that he exhibits behavioral disorders which extend over a period of time and interfere with his ability to build or maintain satisfactory interpersonal relationships and adversely affect his ability to learn without special services."  Tr. at 146.  Dr. Degnan noted in her findings in 1982 that "Joseph comes across as an immature, narcissistic, ineffective personality.  His self-esteem is very poor and he does not trust people . . . .  Joseph's lack of self-confidence

26

the ALJ must consider the combined effect of all of the claimant's impairments on his ability to function, without regard to whether each alone is sufficiently severe.[15] See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d at 122. The ALJ failed to do so in this case. The ALJ considered Beasich's impairments separately and concluded that each impairment was independently not a severe impairment during the period at issue. The ALJ should have considered the combination of Beasich's impairments. The record

and feelings of inadequacy are handled using aggressive measures. There are indications of hostility and an anti-social approach to problems . . . . Because his self-esteem and [self-]confidence are so damaged, he responds in an impulsive, suspicious way, especially to authority." Tr. at 150. In 1984 Dr. Pertchik diagnosed Beasich as having probable post traumatic behavioral changes, and noted that Beasich might have a personality disorder.

[14]Both Beasich and his mother testified about Beasich's symptoms of depression in the period from 1984 to 1988. In addition, when Dr. Cavaiola performed a psychodiagnostic evaluation on Beasich in 1996, his diagnostic impression was that Beasich's mood disorder stemmed from his head trauma, and his prognosis for Beasich was "[g]uarded at best given the number of years that [he] has been functioning at a limited level." Tr. at 190. When the SSA had Beasich examined by Dr. Makhija in January 1997, Beasich indicated that he had felt depressed for many years.

[15]See SSR 85-28 ("Although an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities, the possibility of several such impairments combining to produce a severe impairment must be considered. Under 20 CFR, sections 404.1523 and 416.923, when assessing the severity of whatever impairments an individual may have, the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his or her activity as if each impairment existed alone. A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities. If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process.").

27

supports a conclusion that the combination of Beasich's impairments constituted more than a "slight abnormality" that had "no more than a minimal effect on his ability to do work" and this is all that Beasich needed to show to prove severity at step two. See SSR 85-28; Smolen, 80 F.3d at 1290. However, we think that the ALJ rather than this court should make the definitive step-two determination and accordingly the ALJ should do so on the remand we are ordering.

(b) The ALJ Failed To Apply SSR 83-20

Beasich contends that the ALJ failed to apply SSR 83-20. Reply br. of appellant at 5. SSR 83-20 provides ALJs with an analytical framework for determining a disability onset date. SSR 83-20 defines the "onset date of disability" as "the first day an individual is disabled as defined in the Act and the regulations." In cases in which the onset date is critical to a determination of entitlement to benefits, an ALJ must grapple with and adjudicate the question of onset, however difficult. See SSR 83-20. ("In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability. In many claims, the onset date is critical; it may . . . even be determinative of whether the individual is entitled to or eligible for any benefits.").[16]

Here there was no dispute that, in the context of a separate application for SSI benefits, Beasich was determined to have been "disabled" as of August 1, 1996, by his

_____

[16]Under SSR 83-20, an ALJ should consider three factors in determining an onset date: (1) the claimant's allegations; (2) the claimant's work history; and (3) medical and other evidence.

psychiatric condition that was the result of his head injury in 1981.  In view of that earlier

SSI disability finding, the task of the ALJ in the context here was to determine onset --

i.e., when Beasich's impairments first became disabling.  An earlier onset date assessment

is mandated when a claimant already has been found disabled and alleges an earlier

disability onset date.[17]  SSR 83-20 mandated that this analysis be undertaken even in the

face of a lack of contemporaneous medical evidence documenting Beasich's mental

condition as of 1988 and earlier:

> With slowly progressive impairments, it is sometimes impossible to
> obtain medical evidence establishing the precise date an impairment
> became disabling.  Determining the proper onset date is particularly
> difficult, when, for example, the alleged onset and the date last worked
> are far in the past and adequate medical records are not available. In
> such cases, it will be necessary to infer the onset date from the medical
> and other evidence that describe the history and symptomatology of the
> disease process . . . .
>
> In some cases, it may be possible, based on the medical evidence to
> reasonably infer that the onset of a disabling impairment(s) occurred
> some time prior to the date of the first recorded medical examination . . .
> . How long the disease may be determined to have existed at a disabling
> level of severity depends on an informed judgment of the facts in the
> particular case.  This judgment, however, must have a legitimate
> medical basis. At the hearing, the administrative law judge (ALJ) should
> call on the services of a medical advisor when onset must be inferred. . .

---

[17]The Commissioner suggests that because this is a childhood disability case "a disability onset date was not necessary in this case."  Br. of appellee at 26.  While SSR 83-20 states that "[i]n most title II childhood disability cases, a precise onset date need not be established as long as disability is found to have begun prior to attainment of age 22," in this case Beasich was found to have been disabled as of August 1, 1996, and the purpose of the hearing before the ALJ was to determine if the onset of disability was prior to the age of 22.

.

> If reasonable inferences about the progression of the impairment cannot
> be made on the basis of the evidence in file and additional relevant
> medical evidence is not available, it may be necessary to explore other
> sources of documentation.  Information may be obtained from family
> members, friends, and former employers to ascertain why medical
> evidence is not available for the pertinent period and to furnish
> additional evidence regarding the course of the individual's condition.

Beasich is correct that the ALJ in this case failed to follow this formula.  The ALJ erred by not consulting a medical advisor to help him infer onset date as required by SSR 83-20 and our decision in Walton v. Halter, 243 F.3d 703 (3d Cir. 2001).[18] Some of Beasich's impairments were slowly progressive impairments, Beasich alleged an onset date that was far in the past, and there was not a complete medical chronology of his impairments such that the ALJ could choose an appropriate onset date without the aid of a medical advisor.  Medical inferences needed to be made and therefore the ALJ should have called upon the services of a medical advisor.  See DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires

---

[18]In Walton, as in this case, a claimant receiving SSI benefits needed to establish a remote onset date in order to receive child's disability insurance benefits predicated on his deceased father's employment record.  See id. at 705.  We held that the ALJ must call upon the services of a medical advisor in a situation where the alleged impairment was a slowly progressing one, the alleged onset date was far in the past, and adequate medical records for the most relevant period were not available.  See id. at 709.

the administrative law judge to call upon the services of a medical advisor."); Spellman v. Shalala, 1 F.3d 357, 363 (5th Cir. 1993) ("Because Spellman's mental impairment was of a slowly progressive nature, and the medical evidence was ambiguous with regard to the disability onset date, the Appeals Council could not have inferred an onset date based on an informed judgment of the facts without consulting a medical advisor."); Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995) ("the date on which the synergy [of the claimant's numerous ailments] reached disabling severity remains an enigma. In the absence of clear evidence documenting the progression of Bailey's condition, the ALJ did not have the discretion to forgo consultation with a medical advisor.").

## III. CONCLUSION

A district court, after reviewing the decision of the Commissioner may under 42 U.S.C. § 405(g) affirm, modify, or reverse the Commissioner's decision with or without a remand to the Commissioner for a rehearing. Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984). A court of appeals also retains this discretion and, in reversing or modifying the Commissioner's decision, may choose to remand the case to the Commissioner for a further hearing or simply direct the district court to award benefits. Id. The decision to direct the district court to award benefits should be made only when the administrative record of the case has been developed fully and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to

benefits. Id. at 221-22. As Beasich notes, this case has not been developed fully as the ALJ did not proceed beyond step two of the five-step sequential evaluation. See br. of appellant at 36. We therefore will reverse the district court's order entered July 30, 2002, affirming the Commissioner's decision and remand this case to the district court for it in turn to remand it to the Commissioner for further administrative proceedings pursuant to 42 U.S.C. § 405(g) consistent with this opinion. In particular, the ALJ should reconsider his determination on step two and then, if he finds that Beasich has a severe impairment or combination of impairments, continue on with the sequential evaluation process.

TO THE CLERK:

Please file the foregoing not precedential opinion.

/s/ Morton I. Greenberg
Circuit Judge