NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3641
_____

HALLIE W. THELOSEN,

Appellant

v.

COMMISSIONER OF SOCIAL SECURITY
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-07-cv-06140)
District Judge:  Honorable Joel A. Pisano
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 15, 2010

Before:  FISHER and COWEN, *Circuit Judges*, and DITTER,[*] *District Judge*.

(Filed: June 17, 2010)
_____

OPINION OF THE COURT
_____

_____

[*]Honorable J. William Ditter, Jr., Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

DITTER, *District Judge*.

This is an appeal from the final order of the United States District Court for the District of New Jersey affirming the decision of the Commissioner of Social Security denying Hallie TheLosen's applications for disability benefits provided by Title II of the Social Security Act. We are presented with two questions: 1) whether the decision of the Commissioner that TheLosen did not have a severe impairment during the relevant periods is supported by substantial evidence; and 2) whether the Commissioner was required to seek the help of a medical expert to infer an earlier disability onset date. The District Court answered the first question in the affirmative; the second in the negative. We will affirm.

I.

TheLosen filed applications for supplemental security income benefits ("SSI"), disability insurance benefits ("DIB"), and disabled adult child benefits ("DAC"). She alleged disabilities beginning in 1977 related to eye disease, allergies, a learning disability, and anxiety-related disorders. Her application for SSI was approved and she was awarded benefits retroactive to June 25, 2002, the date she applied for benefits and the earliest date of her SSI eligibility.

To qualify for DAC, TheLosen was required to establish that she was disabled prior to her twenty-second birthday – October 13, 1995. To qualify for DIB, TheLosen was required to establish she became disabled during her last employment or the statutory

2

period – in her case, on or before March 31, 2001. Her applications for DAC and DIB were denied because the Administrative Law Judge ("ALJ") determined that TheLosen did not establish the onset of a severe disability within either of the applicable insured periods.

II.

A social security claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. §§ 404.1520, 416.905. The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims. This five-step evaluation is codified at 20 C.F.R. §§ 404.1520, 416.920.[1]

---

[1]These steps are summarized as follows:

1. If the claimant is working or engaged in substantial gainful activity, a finding of not disabled is directed. If not, proceed to Step 2. 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. If the claimant is found not to have a severe impairment which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed. If there is a severe impairment, proceed to Step 3. 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. If the impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 of Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed. If not, proceed to Step 4. 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. If the claimant retains the residual functional capacity to perform past relevant

TheLosen contends that the ALJ erred in concluding, at step two, that she was not eligible for DIB or DAC benefits because she did not have a severe impairment prior to March 31, 2001. TheLosen contends this determination is not supported by substantial evidence and that the ALJ failed to properly develop the record consistent with Social Security Ruling ("SSR") 83-20. TheLosen contends it was reasonable to infer from the severity of her impairments as of her award of SSI benefits in June 2002 that her impairments existed long before that time. However, the inference of an earlier onset date must have some basis in the medical evidence; it is not enough to simply prove a current disability.

III.

We write exclusively for the parties, who are familiar with the factual and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

---

work, a finding of not disabled is directed. If it is determined that the claimant cannot do the kind of work he or she performed in the past, proceed to Step 5. 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. The Commissioner will then consider the claimant's residual functional capacity, age, education, and past work experience in conjunction with the criteria listed in Appendix 2 to determine if the claimant is or is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

A. Education and Work History

TheLosen was born on October 13, 1973. She graduated from high school in 1993 and from college in 2001. She is also certified in computer training. TheLosen's work experience is very sparse. She worked two part-time jobs in 1990 during high school and she was employed at two different retail stores in 1995. She participated in a work program for the disabled sponsored by the United States Department of State in the summer of 1998. In the winter of 1999-2000, TheLosen was employed at the Center for Orthopedics and Sports performing secretarial duties. At the time of the administrative hearing, TheLosen was unemployed and living with her mother.

TheLosen alleges that she suffered from learning disabilities beginning in 1977. This testimony was supported by her mother. TheLosen testified that in first through seventh grades, she received remedial assistance in reading, mathematics, and writing and that she was diagnosed with dyslexia in the fifth grade. However, her assertion that she was enrolled in special education classes throughout high school was not supported by her school records.

As a student at Ocean County College in August 1993, TheLosen was evaluated by Jorene Burke, a learning disability specialist. Burke's report indicates that TheLosen's learning deficits were evident in the area of processing speed, short-term memory, and basic reading. She demonstrated strength in broad mathematics, passage comprehension, and holistic written expression. Her persistence, motivation, and ability to advocate for

her academic needs were credited for her performing better than might otherwise be expected. To accommodate TheLosen's limitations, the college provided multi-sensory learning, alternative test sites, extended time for assignments and tests, and seating at the front of the class. With these accommodations, TheLosen was able to successfully complete her college education.

Cognitive testing conducted in September 1999 revealed that TheLosen's short-term memory and her IQ scores were within the average range. She also demonstrated good word knowledge and verbal fluency.

A form report to the New Jersey Disability Services, dated December 3, 2001, completed by Michael DiBella, M.D., described her primary diagnosis as an unspecified learning disability, and two minor diagnoses of motor vehicle accident injury and seasonal pollens. As to these minor diagnoses, Dr. DiBella notes an onset date of her "injury" as June 2001, the date TheLosen reported she was in a motor vehicle accident. (A.R. 179). He opines that she is unable to engage in any work activity, voluntary or community service, or educational or vocational training. He also classifies her orthopedic limitations as "Class III: a functional capacity adequate to perform only little or none of the duties of usual occupation or of self-care." *Id.* Dr. DiBella's report does not describe any diagnostic testing performed to support his conclusions.

In contrast with earlier IQ testing, Eleanor Siegal, Ph.D.,[2] in January 2003, placed TheLosen (then age 29) in the borderline range of intellectual functioning: her arithmetic score was in the mentally retarded range and her attention span and perceptual organization skills were poor. Dr. Siegel does not indicate that she reviewed TheLosen's prior testing scores and she provides no explanation for the disparity in her conclusions and those earlier results.

B.      Medical History

1.      Eye Disease (Thygeson's Superficial Punctate Keratitis ("TSPK"))[3]

TheLosen was first treated for complaints of eye pain, redness, tearing, and photosensitivity in July 1993. She was diagnosed with TSPK and prescribed contact lenses, antibiotics, eye drops, and mild steroids. Although she had recurrences of this condition throughout the years, with flare-ups occurring about once a year, TheLosen's vision remained 20/20 or better.

2.      Allergies

TheLosen has a history of allergies beginning when she was sixteen. TheLosen testified that her allergies caused her to end brief periods of employment at a bakery in

---

[2]TheLosen was referred for a consultative examination by Dr. Siegel at the request of the agency as a result of her application for disability benefits.

[3]*Thygeson's superficial punctate keratitis* is an eye disease primarily affecting the cornea and is generally characterized by the presence of small epitheal lesions. *Dorland's Illustrated Medical Dictionary* 972-73 (30th ed. 2003).

7

1993 and at a retail store in 1995. In December 1995, a CT scan suggested mild but chronic sinusitis. She has routinely been treated with allergy medications.

In May 2001, TheLosen was treated for recurring sinus problems and breathing difficulties. She was diagnosed with severe allergic rhinitis and prescribed medication. A CT scan showed no evidence of acute or chronic sinusitis. TheLosen was referred to Robert Rabinowitz, D.O., for treatment of her allergies in September 2001. She complained of persistent symptoms of postnasal drip, headaches, and significant sensitivity to a variety of acroallergans including mold, dust, grass, and perfumes. TheLosen was diagnosed with allergic rhinitis and possible chronic sinusitis and prescribed Claritan D, Astelin, and Zithromax. It was also recommended that she consider allergy injections.

TheLosen's treatment continued in 2002. In July 2002, she reported an instance of loss of consciousness when she visited a new store and felt overcome by strong smells. She continued on medication, and again it was recommended that she consider allergy injections. She was also advised to carry an Epi-Pen and Benadryl with her on a regular basis.

3.    Mental Disorders

It was also during her December 2001 appointment with Dr. DiBella that TheLosen complained of difficulty sleeping and anxiety attacks. His report does not include any anxiety-related diagnosis or evaluation, but Dr. DiBella did prescribe Paxil,

8

an anti-anxiety medication. In September 2002, TheLosen requested a refill of her prescription for Paxil when she was examined at the Community Medical Center. The attending physician requested that she first undergo a psychological evaluation – a request she refused. Her progress notes from the Community Medical Center indicate she was diagnosed with anxiety in October 2002 and also notes her refusal to participate in any counseling.

In her evaluation with Dr. Siegel in January 2003, TheLosen reported that she was suffering from panic attacks – the most recent occurring the day before the evaluation. Dr. Siegel noted that TheLosen was prescribed Paxil by her family physician, and that she was still not being treated by a psychologist or psychiatrist. TheLosen also reported difficulty sleeping, obsessive-compulsive symptoms, and a general loss of interest. Dr. Siegel diagnosed TheLosen as suffering from a panic disorder with agoraphobia,[4] obsessive-compulsive disorder, and somatoform[5] disorder (not otherwise classified).

C.    Administrative Hearing

On February 6, 2003, a state agency psychological consultant, Ira Gash, Ph.D., completed a mental residual capacity assessment and psychiatric review based on Dr. Siegel's report. It was Dr. Gash's opinion that TheLosen's psychological impairments

---

[4]*Agoraphobia* is an intense, irrational fear of open spaces, characterized by a marked fear of being alone or of being in public places where escape would be difficult and may be associated with panic attacks. *Dorland's* at 40.

[5]*Somatoform* denotes physical symptoms that cannot be attributed to organic disease and appear to be of a psychic origin. *Dorland's* at 1722.

were the basis for her disability and that her physical limitations were only "contributing factors." (A.R. 290, 292).

In April and August 2003, two other agency psychological consultants analyzed the severity of TheLosen's condition from October 1995 through March 31, 2001. These consultants determined that there was insufficient evidence that TheLosen's impairments were severe at any time prior to March 31, 2001, thus providing substantial evidence that would preclude DAC and DIB awards. However, TheLosen was awarded SSI benefits based on her psychological impairments. She requested an administrative hearing to consider the denial of DAC and DIB.

An administrative hearing was held on June 23, 2005, during which the ALJ heard testimony from TheLosen and her mother. Because this testimony described impairments that were of a greater severity than were shown by the school and medical records that had been submitted, the ALJ left the record open for thirty days to permit counsel to provide further documentation. No additional evidence was submitted and her applications for DAC and DIB were denied in the ALJ's decision dated November 9, 2005.

IV.

We agree with the thorough and well-reasoned opinion of the District Court that the decision of the Commissioner is supported by substantial evidence. The ALJ

carefully considered the medical evidence and the testimony of Ms. TheLosen and her mother and provided sufficient explanation for his determination of her onset date.

TheLosen claims that the decision of the Commissioner is erroneous, but she does not point to any evidence in the record that would support a finding that she suffered from a severe impairment prior to October 13, 1995, or March 31, 2001. Despite her learning disability, allergies, and chronic eye problems, she successfully graduated from high school and college. Her TSPK was chronic with sporadic flare-ups, but was treated with mild steroids. There is no evidence that it ever seriously limited her activities of daily living.

Similarly, her allergies were consistently described in the medical records as mild in nature. It was not until September 2001 that she was diagnosed with sinusitis and allergic rhinitis, consistent with TheLosen's testimony that her allergies had worsened with age. Still, TheLosen was treated with common allergy medications and the medical records do not indicate any significant functional limitations resulting from her condition.

Clearly, the medical and school records were not consistent with TheLosen's and her mother's testimony describing the severity of her various aliments. In particular, the high school records provided did not indicate she was enrolled in a special education program. The ALJ provided TheLosen with an opportunity to supplement the record to resolve this conflict but no additional evidence was submitted. TheLosen's ability to

successfully complete high school, college, and computer training is strong evidence that her learning disability was not severe prior to March 31, 2001.

Finally, the earliest record of her psychological issues appears to be Dr. DiBello's notes from December 2001. TheLosen reported difficulty sleeping, not wanting to leave her home, and anxiety attacks. His designation of June 2001 as an onset date appears to be based on the date she was injured in a motor vehicle accident and seems to be related to the orthopedic problem she was having at that time – not any psychological diagnosis. In fact, TheLosen was not diagnosed with anxiety until 2002, and her panic disorder, obsessive-compulsive disorder, and somatoform disorder were first diagnosed in 2003. Her medical records were reviewed by agency consultants who found insufficient evidence to conclude that her impairments were severe prior to June 2002.[6] The ALJ properly relied on the consultants' reports to determine the severity of her impairments and the onset date of her disability.

The District Court was also correct in rejecting TheLosen's claim that the ALJ failed to adequately develop the record as required by SSR 83-20. TheLosen contends the ALJ was required to consult a medical advisor to assist him in reaching by inference earlier dates for the onsets of her disabilities.

_____

[6]We note that TheLosen contends the ALJ erred in simply adopting this date as the onset date because it was based on the date of her application for benefits as required under SSI, but this is not a correct statement. The ALJ found she was not eligible for DIB or DAC benefits because she could not establish a severe impairment within the applicable insured periods.

SSR 83-20 describes the individual's allegation, work history, and medical evidence as the factors relevant to a determination of the onset date of a disability. SSR 83-20. Medical evidence is the primary consideration in determining the disability onset date. *Id.* The claimant's alleged date or the date she last worked are significant only if consistent with the severity of the conditions shown by medical evidence. *Id.* A medical advisor should be called where the impairment at issue is slowly progressing and the alleged onset date is so far in the past that obtaining adequate medical records is impossible. *See id.*; *Walton v. Halter*, 243 F.3d 703, 709 (3d Cir. 2001).

In this case, the ALJ had access to the medical records from the 1990s and those records were reviewed by medical consultants who determined there was no support for earlier onset dates. After considering the medical evidence, the consultative reports, and the hearing testimony, the ALJ determined that the evidence did not support a finding, at step two of the sequential evaluation, that TheLosen had a severe impairment at a time that would qualify her to receive DIB or DAC benefits.

In short, TheLosen contends the ALJ should have sought medical assistance so that by inference he could reach a conclusion that would be contrary to the medical evidence already before him. We find the District Court was correct in concluding that the ALJ properly considered the medical evidence before him and was not required to obtain additional assistance.

For these reasons, we will affirm the judgment of the District Court.